# EXHIBIT A

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of this 2nd day of December, 2010 by and among GTO, LLC, a Washington limited liability company ( "Purchaser"), on the one hand, and Meridian Transportation Resources, LLC, a Washington limited liability company ("MTR"), Meridian Transportation Resources (California), LLC, a California limited liability company ("CA"), Meridian Transportation Resources (Canada), Ltd., a federal corporation extraprovincially registered in British Columbia ("LTD"), MTR Leasing, LLC, a Washington limited liability company ("Leasing"), and Geogenius, LLC, a Washington limited liability company ("Geogenius") (collectively the "Seller" or the "Company;" individually the "Seller Entities"), on the other hand.

## RECITALS:

A.     The Seller Entities together comprise an enterprise known as "MTR Western," which operates a premium motorcoach fleet for charter in the western United States and western Canadian Provinces.

B.     The Seller Entities each filed voluntary petitions[1] (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § § 101, et seq. (the "Bankruptcy Code") on November 15, 2010 ("Petition Date") in the United States Bankruptcy Court for the Western District of Washington (the "Bankruptcy Court"), which have been consolidated under Case Number 10-18668-KAO ("Bankruptcy Case") for administration, with Diana K. Carey ("Trustee") appointed Chapter 11 trustee, who is continuing to manage the Seller Entities' property as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code

C.     The Trustee is also the Manager or President of each of the Seller Entities by virtue of her appointment as Trustee of Frederick Darren Berg, the sole shareholder or member of all of the Seller Entities.

D.     Purchaser desires to purchase certain assets from the Seller Entities, and the Seller Entities desire to sell, convey, assign, and transfer to Purchaser such assets pursuant to the terms and conditions of this Agreement.

E.     The purchase and sale of the assets pursuant to the terms of this Agreement requires an order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and the assumption and assignment of the Assumed Executory Contracts (as defined below) under Section 365 of the Bankruptcy Code.

---

[1] The case numbers assigned to each of the Seller Entities are: MTR – 10-23756-KAO; CA – 10-23757-KAO; LTD – 10-23755-KAO; Leasing – 10-23761-KAO; and Geogenius – 10-23759-KAO. LTd., has also sought and obtained an Order of recognition of its US bankruptcy case in the Supreme Court of British Columbia, Vancouver Registry, in Bankruptcy and Insolvency under case no. S-107609 on November 19, 2010.

{01498055.DOC;5 }

# ARTICLE 1

DEFINITIONS

**Section 1.1    Defined Terms.**  All references to "sections" or "articles" are references to sections or articles of this Agreement unless otherwise stated.  As used in this Agreement, the terms below shall have the following meanings:

"Accounts Receivable" shall mean all accounts, as that term is defined under the Uniform Commercial Code (as enacted in the State of Washington), of Seller, whether current or non-current, including without limitation, trade accounts receivables (including, without limitation, accounts receivable for any product shipped or service provided prior to the Closing Date but not invoiced) outstanding as of the Closing Date and any other rights to receive payment for sales as of the Closing Date in respect of goods shipped, products sold or services rendered prior to the Closing Date.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Acquisition Proposal" means a proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of any of the Acquired Assets pursuant to one or more transactions, the sale of any of the outstanding shares of capital stock or equity interests of the Company (including, without limitation, by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one or more Third Parties and the Company.

"Affiliate" shall have the same meaning as in the Bankruptcy Code.

"Agreement" shall have the meaning as described in the Preamble herein.

"Assignment Motion" shall have the meaning set forth in Section 6.4(b).

"Assumed Executory Contracts" shall have the meaning set forth in Section 2.2(a).

"Assumed Liabilities" shall have the meaning set forth in Section 2.2.

"Auction" shall mean the auction conducted by Seller pursuant to the Bidding Procedures Order.

"Bankruptcy Code" shall have the meaning as described in the Recitals.

"Bankruptcy Court" shall have the meaning as described in the Recitals.

"Bidding Procedures Order" means an order of the Bankruptcy Court (i) setting a deadline for the filing of objections to the entry of the Sale Order, providing that any Auction shall be held no more than three (3) days prior to the Sale Hearing, and scheduling the Sale Hearing, (ii) approving the competitive bidding procedures pursuant to which other bids may be solicited, made and accepted in the form attached hereto as Exhibit A, and (iii) approving the Break-Up Fee.

"Books and Records" shall mean all books and records pertaining to the Acquired Assets of any and every kind, including, without limitation, lists, program inventory lists, engineering, information, sales and promotional literature, manuals and data, sales and purchase correspondence, title reports and policies, files and records relating to management and administration of the Leases, store layout and fixturing plans, lists of present, former and prospective suppliers or customers, correspondence, compact disks, compact disk lists, ledgers, files, reports, plans, drawings and operating records of every kind, held or maintained by Seller, disk or tape files, printouts, runs or other computer-prepared information pertaining to the Acquired Assets, but excluding corporate books and records of the type described in the definition of Excluded Assets.

"Break-Up Fee" shall have the meaning set forth in Section 10.2(e).

"Business Day" shall mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of Washington or is a day on which banking institutions located in the state are authorized or required by law or other governmental action to close.

"Claim" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing Date" shall have the meaning set forth in Section 3.1.

"Closing" shall have the meaning set forth in Section 3.1.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Critical Vendors" shall have the meaning set forth in Section 2.2(b).

"Critical Vendors Amount" shall have the meaning set forth in Section 2.2(b).

"Customers" shall mean all of the customers or prospective customers of Seller.

"Deposit" shall have the meaning set forth in Section 2.6(b).

"Deposit Agent" shall mean the law firm Karr Tuttle Campbell.

"ERISA" shall mean the Employee Retirement Income Security Act.

"ERISA Affiliate" shall mean any entity required to be aggregated in a controlled group or affiliated service group with Seller for purposes of ERISA or the Code (including under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA), at any relevant time.

"Excluded Assets" shall have the meaning set forth in Section 2.3.

"Existing Contracts" shall mean all oral or written contracts, agreements or understandings, including, but not limited to MTR Customer Contracts, other customer contracts, real or personal property leases, subleases, licenses, software support agreements, Permits,

{01498055.DOC;5 }

distribution arrangements, sales and purchase agreements, and purchase and sale orders to which any of the Seller Entities is a party.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under F.R.C.P. 60(b)) or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Governmental Authority" means any United States federal, state or local, or any foreign, government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Indebtedness" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include without limitation (i) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business, (ii) the face amount of all letters of credit issued for the account of such Person, (iii) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens, (iv) capitalized lease obligations, (v) all guarantees and similar obligations of such Person, (vi) all accrued interest, fees and charges in respect of any indebtedness and (vii) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"Intellectual Property" means any and all U.S. and foreign: (i) inventions (whether patentable or unpatentable and whether or not reduced to practice, all improvements thereto, and patents, patent applications, patent disclosures together with all renewals, reissuances, divisions, continuations, continuation-in-part, substitutes, extensions, and reexaminations of the foregoing, (ii) trademarks, service marks, trade dress, trade names, logos and corporate names and registrations, renewals, and applications for registration thereof together with all of the goodwill associated therewith, (iii) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof, (iv) mask works and registrations and applications for registration thereof, (v) design rights (registered or unregistered) and applications for registration thereof, (vi) computer software (in both source code and object code form and all commented versions thereof), whether purchased, licensed or internally developed, data, data bases and documentation thereof, including without limitation the GeoGenius software program and the right to the use of software used by Seller for maintenance records, scheduling and other matters related to the operation of Seller's Business; (vii) all mask works and all applications, registrations and renewals in connection therewith, (viii) trade secrets, proprietary formulations and other confidential information (including, without limitation, ideas, formulas, compositions, know-how, show-how, manufacturing and production processes and techniques, research and development information and results, engineering, quality control, testing, operations, logistical, maintenance and other technical information, drawings, diagrams, catalogs, specifications, designs, plans, proposals, technical data, copyrightable works, pricing and cost information, financial and marketing plans, business plans and proposals, customer and supplier lists and information), (ix) internet domain names and web sites, (x) registrations and

{01498055.DOC;5 }

applications for any of the foregoing, and (xi) copies and tangible embodiments thereof (in whatever form or medium).

"IRS" shall mean the Internal Revenue Service.

"Key Employees" shall mean Chris Apken, Terry Fischer, Kevin Kilpatrick, Brian Parker, Fred Thiel, and Susan Rozewski.

"Knowledge" shall mean the actual knowledge, rather than constructive or imputed knowledge, without duty to make inquiry, of the Key Employees, Eric Orse and Trustee.

"Liabilities" shall mean all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including without limitation all liabilities for Indebtedness and Taxes.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax (including foreign, federal, state and local Tax), order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Purchaser is a successor, transferee or continuation of Seller and (iv) any leasehold interest, license or other right, in favor of a Third Party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Effect" or "Material Adverse Change" shall mean any change, development or effect that has been, or would reasonably be expected to be materially adverse to the Acquired Assets, the business currently being operated by the Seller or to the ability of Seller to consummate the transactions contemplated hereby, or any effect or condition which would, with the passage of time, constitute a "material adverse effect" or "material adverse change."

"MTR Employees" shall mean all individuals employed by Seller.

"MTR Customer Agreements" shall mean any and all motorcoach transportation agreements with respect to any Seller Entity customers, including, but not limited to those in the United States and Canada relating to the operation of MTR Western branded motorcoach companies, expressly excluding any and all customer agreements with MTR affiliates CGT Enterprises, Inc., an Oregon corporation, Columbia Gorge Tours, Inc., an Oregon corporation, and Oregon Coachways, Inc., an Oregon corporation (dba OC&W); MTR Customer Agreements also expressly excludes any agreements between LTD and Sightline Tours.

"Order" means any decree, order, injunction, rule, judgment, or consent of or by any Governmental Authority.

{01498055.DOC;5 }

"<u>Ordinary Course of Business</u>" shall mean the ordinary course of business of Seller Entities consistent with past custom and practice (including with respect to quantity and frequency), taking into account the effect of the filing of the Petition on any Seller Entities which are Chapter 11 debtors and consequent limitations on Seller's operations.

"<u>Other Interested Parties</u>" means any Third Party with whom Seller has, prior to the date of this Agreement, engaged in substantive discussions concerning a potential Acquisition Proposal.

"<u>Permit</u>" shall mean all licenses, permits, franchises, approvals, authorizations, consents or orders of, or filings with, or notifications to, any Governmental Authority, whether foreign, provincial, municipal, federal, state or local, necessary for the past or present conduct or operation of Seller's business.

"<u>Person</u>" shall mean any individual, corporation, partnership, limited liability company, trust, association, joint venture or other entity of any kind whatsoever.

"<u>Petition</u>" has the meaning set forth in the preamble.

"<u>Petition Date</u>" shall mean the date upon which the Seller Entities filed their Petition.

"<u>Pre-Petition Obligations</u>" means Seller's Liabilities occurring prior to the Petition Date.

"<u>Purchase Price</u>" shall have the meaning as described in Section 2.6(a).

"<u>Purchase Price Allocation Schedule</u>" shall have the meaning set forth in Section 2.7.

"<u>Purchaser</u>" shall have the meaning as described in the Preamble herein.

"<u>Purchaser Annual EBITDA</u>" shall mean Purchaser's earnings before interest, taxes, depreciation, amortization and the direct operating lease cost of the Motor Coaches for the year in question, as determined in accordance with generally accepted accounting principles by Purchaser's regular independent accounting firm. For purposes of calculating Purchaser Annual EBITDA all transactions between Purchaser and its Affiliates shall be based on fair market value of the products or services provided.

"<u>Qualifying Bid</u>" shall have the meaning given to it in the Bidding Procedures Order.

"<u>Representative</u>" shall mean any attorney, accountant, agent, independent contractor or other representative.

"<u>Required Diligence Notice</u>" shall have the meaning as described in Section 8.3.

"<u>Sale Hearing</u>" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated by this Agreement.

"Sale Order" means the order of the Bankruptcy Court obtained after proper notice to creditors and parties in interest consistent with the Bankruptcy Code, in form attached hereto as Exhibit E, in its sole discretion, to be entered by the Bankruptcy Court pursuant to Sections 363and 365 of the Bankruptcy Code: (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale of the Acquired Assets to Purchaser free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code; (iii) approving the assumption and assignment to Purchaser of the Assumed Executory Contracts pursuant to Section 365(f)(2) of the Bankruptcy Code; (iv) transferring and assigning the Assumed Executory Contracts such that the Assumed Executory Contracts will be in full force and effect from and after the Closing; (v) finding that Purchaser is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (vi) confirming that Purchaser is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; (vii) providing that the provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (viii) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement; and (ix) authorizing the results of the Auction, if one occurs.

"Schedules" means the Schedules attached to this Agreement.

"Seller's Business" shall mean business as conducted by Seller Entities prior to the Closing.

"Taxes" shall mean all taxes, duties, charges, fees, registration fees, revenue permit fees, levies, penalties or other assessments imposed by any Governmental Authority or political subdivision thereof, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value added or gains taxes, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties or additions attributable thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against Seller.

"Third Party" means any Person other than Seller, Purchaser and any of their respective Affiliates.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Transfer of Assets.**   Upon the terms and subject to the conditions and provisions of this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Purchaser, free and clear of all Liens, and Purchaser shall acquire and accept from Seller, all right, title and interest in and to all of the assets, properties, business and rights of any and every kind owned by Seller or principally used in Seller's Business, whether tangible or intangible, real or personal, including,

{01498055.DOC;5 }

without limitation, the following assets (but exclusive, in all cases, of the Excluded Assets) (all of the assets to be sold, assigned, transferred and delivered to Purchaser hereunder, the "Acquired Assets"):

(a) Inventory. All inventories of parts or other equipment, which are used or held for use by Seller, together with all rights of Seller against suppliers of such inventories (the "Inventory");

(b) Tangible Personal Property. All furniture, fixtures, equipment, parts, machinery and other tangible personal property (other than Inventory) of Seller, including the tangible personal property such as all computers and software, and personal property related thereto, including all computer racks, cables and racks listed on Schedule 2.1(b) (the "Tangible Personal Property");

(c) Personal Property Leases. The leases or subleases of Tangible Personal Property as to which Seller is the lessee or sublessee, together with any options to purchase the underlying property (the leases and subleases are collectively referred to herein as the "Personal Property Leases"), but only if such leases or subleases are designated by Purchaser as Assumed Executory Contracts;

(d) Client List. Seller's current and prospective Customer lists;

(e) Intangible Personal Property. All Intellectual Property of Seller (including Seller's goodwill therein) and all warranties, rights, privileges, claims, causes of action and options relating or pertaining to the Acquired Assets or the Seller's Business, including the name "MTR", the business processes and practices of Seller, together with any Intellectual Property which would be considered an Assumed Executory Contract;

(f) Permits. All licenses, permits, certificates, authorizations and approvals issued by any Governmental Authority, including applications therefor and including without limitation all ICC Permits help by Seller (collectively, "Permits");

(g) Books and Records. All books and records used or held for use in the conduct of the Business or otherwise relating to the Acquired Assets, other than the minute books, charter documents, stock transfer books and records, and corporate seal of Seller;

(h) Deposits. All prepaid assets and deposits, security deposits, deposits with creditors and other deposits of any kind whatsoever;

(i) Goodwill. The goodwill of the Seller's Business;

(i) Contracts. All Existing Contracts which are designated by Purchaser as Assumed Executory Contracts;

{01498055.DOC;5 }

(j)     Real Property Leases.  The leases of real property as to which Seller is the lessee (collectively the "Office Lease"); but only if such leases are designated by Purchaser as Assumed Executory Contracts;

(k)     Motor Coaches.  The motor vehicles identified on Schedule 2.1(l) owned by MTR Leasing.  Schedule 2.1(l) shall identify, among other things, the asset number, type, make, model, year, state of registration, and the vehicle identification number of each motor vehicle owned by MTR Leasing; and

(l)     Other Assets.  The assets set forth on Schedule 2.1(m).

**Section 2.2     Assignment and Assumption of Liabilities.**  Notwithstanding anything to the contrary in this Agreement, Purchaser shall only assume the following Liabilities of Seller (the "Assumed Liabilities"):

(a)     Subject to Seller's obligation to cure any and all related pre-closing obligations, the obligations under the Assumed Executory Contracts first arising after the Closing.  Purchaser shall notify Seller, in writing, of which Existing Contracts it will assume no later than twenty-three (23) days before the Auction date (the "Assumed Executory Contracts").

(b)     Seller's pre-Closing obligations to the vendors identified in the Term Sheet between Purchaser and Seller dated November 3, 2010 (the "Critical Vendors"), in the amount of $551,182 or such other amount as the Purchaser shall designate hereunder ("Critical Vendors Amount"). Section 2.2(a) above shall not limit any claims or defenses Purchaser may have against any party other than Seller Entities.  The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Purchaser or Seller Entities as compared to the rights and remedies which such Third Party would have had against Seller Entities absent the Bankruptcy Case had Purchaser not assumed such Assumed Liabilities.

**Section 2.3     Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement, the following assets of Seller shall be retained by Seller and are not being sold or assigned to Purchaser by this Agreement (all of the following are referred to collectively as the "Excluded Assets"):

(a)     any and all rights, claims, causes of action, including avoidance claims, arising under the Bankruptcy Code (a "Bankruptcy Action" and, collectively, the "Bankruptcy Actions");

(b)     the corporate charter, seals, minute books, stock transfer books and other documents relating solely to the organization, maintenance and existence of Seller as a corporation or other business entity;

(c)     all Existing Contracts which are not Assumed Executory Contracts (the "Excluded Contracts");

(d)     all cash and cash equivalents held by the Seller at Closing;

{01498055.DOC;5 }

(e)     any rights of Seller under this Agreement;

(f)     all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that Seller or Seller's bankruptcy estate may hold against any person or entity, foreign or domestic, under any law whatsoever, except claims that may exist against Purchaser or any of its principals or to the extent related to or arising under any Assumed Executory Contract;

(g)     those Acquired Assets rejected by Purchaser pursuant to written notice by Purchaser to Seller given not later than twenty-three (23) days before the Auction date;

(h)     all rights to payment of any kind due Seller, including Seller's rights and claims, whether known or unknown under existing insurance of any kind;

(i)     except as pro-rated between Purchaser and Seller pursuant to Section 3.4(d), all Accounts Receivable payable to Seller as of the Closing Date;

(j)     all of Seller's rights, claims, credits, immunities, or rights of set-off against third parties (including former and present MTR Employees) relating to the Acquired Assets, including, without limitation, unliquidated rights under warranties, but only to the extent such rights may be used as defenses to payments but not as affirmative claims for recovery; and

(k)     Intelagent Ticketing System and any agreements of the Seller in conjunction with its "Sightline Tours of Canada" business.

**Section 2.4     No Other Liabilities Assumed.**   Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume any Liability of Seller, other than the Assumed Liabilities.   In furtherance and not in limitation of the foregoing, neither Purchaser nor any of its Affiliates shall assume, and shall not be deemed to have assumed, any debt, Claim, obligation or other Liability of Seller whatsoever, including, but not limited to the following (collectively, the "Unassumed Liabilities"):

(a)     all Claims or Liabilities of Seller that relate to any of the Excluded Assets or the Existing Contracts that are not Assumed Contracts;

(b)     any cure obligations, costs and fees (pursuant to Section 365 of the Bankruptcy Code) with respect to any Assumed Executory Contract;

(c)     other than the Assumed Liabilities, all Liabilities of Seller;

(d)     any Liability arising out of any action or proceeding arising out of, or relating to, any occurrence or event happening prior to the Closing;

(e)     all Claims or Liabilities (whether known or unknown) with respect to the current or former MTR Employees, including, without limitation, payroll, paid or unpaid vacation, sick leave, worker's compensation, unemployment benefits, pension benefits,

{01498055.DOC;5 }

employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind including, without limitation, any Liability pursuant to the WARN Act for any action or inaction except to the extent action by Purchaser is specifically required by the WARN Act;

(g)     any Liability arising under or relating to any employee benefit plan of Seller or any other employee benefit plan, program or arrangement at any time maintained, sponsored or contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any Liability;

(h)     any Liability under any employment, collective bargaining, severance, retention or termination agreement with any employee, independent contractor or contractor (or their representatives) of Seller, except to the extent such Liabilities arise after Closing and arise under an Assumed Executory Contract;

(i)     any Liability of Seller to any shareholder or Affiliate of Seller;

(j)     any Liability to indemnify, reimburse or advance amounts to any shareholder, officer, director, employee or agent of Seller;

(k)     any Liability to distribute to Seller's shareholders or otherwise apply all or any part of the consideration received hereunder;

(l)     any Liability arising out of or resulting from non-compliance with any law, ordinance, regulation or treaty of any Governmental Authority by Seller;

(m)     any Liability of Seller under this Agreement or any other document executed in connection herewith;

(n)     any Liability of Seller resulting in any way from (a) the Federick Darren Berg bankruptcy case which is pending in the U.S. Bankruptcy Court for the Western District of Washington at Seattle, Case N. 10 18668 KAO; (b) the Bankruptcy Case; (c) any rights that exist or could be asserted arising out of the bankruptcy proceedings for the Meridian Funds[2]); (d) any other company or entity in which Darren Berg had any ownership or operational involvement or served as an officer or director (before or after the date hereof); or (e) the acts or omissions of Darren Berg before or after the Closing;

(o)     any Liability of Seller for Taxes, including, without limitation, any Liability of Seller in respect of any amount of federal, state or other Taxes (including, without limitation, interest, penalties and additions to such Taxes and any Liabilities relating to Taxes arising (i) as a result of Seller at any time being a member of an affiliated group (as defined in Section 1504(a) of the Code) and (ii) under any Tax allocation, sharing, indemnity, or similar

---

[2] Meridian Fund cases are jointly administered under Case No. 10-17952-KAO in the Bankruptcy Court.

{01498055.DOC;5 }

agreement with any Person) which are imposed on or measured by the activities or income of Seller for any period; and

(p)     any Liability arising out of or resulting from actions taken by Seller prior to Closing related to the shutdown of any of its operations or facilities or the termination of any of its employees or independent contractors including any severance obligations.

(q)     any Liability arising out of or related to any action, suit, claim, arbitration, grievance, complaint, charge or proceeding pending against Seller before any court or arbitrator or any government agency with respect to the Acquired Assets or Seller's Business.

(r)     any Liability arising out of or related to any Seller violation of Environmental Laws (as defined in Section 4.19).

The parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Purchaser, except where such disclosed obligation has been expressly assumed by Purchaser as an Assumed Liability in accordance with the provisions of Section 2.2.

**Section 2.5     Cure Obligations.**  To the extent that any Assumed Executory Contract is subject to a cure (pursuant to Section 365 of the Bankruptcy Code), Seller shall be responsible for the payment of such cure amount.   Seller shall pay such cure amount prior to the disbursement of any funds received by Seller pursuant to this Agreement to any third party, including but not limited to any party that may claim a security interest in such funds.

**Section 2.6     Purchase Price**

**(a)     Purchase Price**.  Subject to any credits and/or reductions provided for in this Agreement, the "Purchase Price" for the Acquired Assets is:

(i) (x) $4,250,000 is payable in cash ("Purchase Price Component A") at Closing; and (y) the assumption of the Critical Vendors Amount, which amount shall be funded by Purchaser at Closing into a segregated account for payment to the identified parties by Seller Entities and Purchaser ("Purchase Price Component B").   All principal and interest due under the Senior Secured, Super Priority Debtor-in-Possession Credit and Security Agreement between Purchaser and Seller (the "DIP Credit Agreement") and the Deposit shall be credited against the Purchase Price Component A. Based on Purchaser's due diligence to date, Purchaser believes that the Critical Vendors Amount totals $551,182.   If for whatever reason, the Critical Vendor Amount is less than $551,182, then Purchaser and Seller understand and acknowledge that the Purchase Price Component A will be increased by an amount equal to the difference; alternatively, if the Critical Vendor Amount is more than $551,182, then the Purchase Price Component A will be decreased by an amount equal to the difference; and

(ii) for each of the Purchaser's 2011 and 2012 fiscal years, Purchaser shall pay to Seller an amount equal to one–half (1/2) of the amount by which Purchaser Annual EBITDA exceeds Three Million Two Hundred Thousand Dollars ($3,200,000) ("Earn-Out Payment"). If Purchaser Annual EBITDA does not exceed Three Million Two Hundred Thousand Dollars ($3,200,000), no Earn-Out Payment will be payable for such year. The Earn-Out Payment, if any, shall be due and payable to Seller no later than 120 days following the end of each such fiscal year 2011 or 2012. The aggregate Earn-Out Payment for both years shall not, in any case exceed One Million Dollars ($1,000,000). In the event that the Closing Date occurs during fiscal year 2011, for the purposes of calculating the Earn-Out Payment for fiscal year 2011, the Purchaser Annual EBITDA that exceeds Three Million Two Hundred Thousand Dollars ($3,200,000) shall be pro rated by multiplying Three Million Two Hundred Thousand Dollars ($3,200,000) by a fraction, the numerator of which is equal to the number of days which shall have elapsed from January 1, 2011 to the Closing Date and the denominator of which is 365. The Purchaser Annual EBITDA above the resulting product shall be used to calculate the Earn-Out Payment.

(b) **Deposit.** On the date hereof, Purchaser shall pay to the Deposit Agent Five Hundred Thousand Dollars ($500,000) (together with interest earned thereon, the "Deposit") to be held by the Deposit Agent in trust to be paid (i) to Seller at Closing as partial payment of the Purchase Price Component A or (ii) upon termination of this Agreement, to Seller or Purchaser, as provided by Section 10.2 below.

**Section 2.7  Allocation Schedule.** No later than five (5) days before Closing, Seller and Purchaser shall mutually agree on the allocation of the Purchase Price and the Assumed Liabilities among the Acquired Assets. Such allocation shall be set forth in an allocation schedule (the "Purchase Price Allocation Schedule") which shall be prepared in a manner required by Section 1060 of the Code and other applicable laws and shall be attached hereto as Schedule 2.7. Seller and Purchaser shall prepare mutually acceptable and substantially identical initial and supplement IRS Forms 8594 "Asset Acquisition Statements under 1060" consistent with the Purchase Price Allocation Schedule (giving effect to mutually agreed upon adjustments through the allocations set forth in the Purchase Price Allocation Schedule as a result of any required adjustments to the Purchase Price).

**Section 2.8  Employee Matters**

(a) <u>Offer of Employment</u>. Subject to and in accordance with the provisions of this Section 2.8, Purchaser may, but shall have no obligation to, offer employment to any or all of the MTR Employees who are employed by Seller as of the date of this Agreement (the "Employees"). Schedule 2.8 attached hereto is a true and correct list of each MTR Employee, their current position, current salary and the location where they are based. Prior to the Closing, Purchaser shall have the right to contact any or all of the Employees for the purposes of making offers of employment with Purchaser after the Closing Date and receiving written acceptances of such employment (in each case contingent on consummation of the transactions contemplated by this Agreement). Each such Employee who is employed by Seller on the Closing Date and who

actually accepts employment with Purchaser after the Closing Date as a result of an offer of employment made by Purchaser is hereafter referred to as a "Transferred Employee." Purchaser shall not be obligated to hire any Employee unless an offer of employment is made to, and accepted by, such Employee; in addition, Purchaser shall have no obligation to hire any Employees of Seller after the Closing Date.

(b) <u>Transition</u>. Seller shall terminate the employment of all Transferred Employees at the close of business on the Closing Date and the employment of the Transferred Employees by Purchaser shall commence at 12:01 a.m. on the day after the Closing Date. The terms of employment with Purchaser shall be as mutually agreed to between each Transferred Employee and Purchaser. Between the date of this Agreement and the Closing Date, Seller will provide each Transferred Employee with the same level of compensation as that currently provided by Seller. Purchaser shall have no obligation with respect to payments of salary, compensation, wages, health or similar benefits, commissions, bonuses (deferred or otherwise), severance, stock or stock options or any other sums due to any Transferred Employee that accrued before the Closing Date. Seller will be fully responsible for all amounts payable to any Employee, including (without limitation) all termination payments, redundancy compensation, severance pay, accrued vacation pay and other amounts payable in respect of the termination of employment of any Employee in connection with the sale of the Purchased Assets to Purchaser. In addition, Seller will be fully responsible for all amounts owing to Transferred Employees prior to Closing.

(c) <u>Compensation and Benefits of Transferred Employees</u>. Coverage for Transferred Employees under Purchaser's compensation and benefit plans and other programs shall commence as of 12:01 a.m. on the day after the Closing Date. Purchaser shall be responsible for any health insurance or other compensation and benefit plan coverage for the Transferred Employees after the Closing Date. Purchaser shall be free to establish its own employee benefit plans and Purchaser shall have no obligation to offer benefit plans of the same type or with terms similar to or better than the terms of Seller's current employee benefit plans.

(d) It is expressly agreed and understood that neither Purchaser nor Seller has any right, power or authority to control, direct or regulate the labor relations and human resources policies and procedures of the other, that neither is deemed to constitute the agent or representative of the other and that neither is liable in any manner whatsoever for the acts or omissions of the other, its agents, representatives or employees. All of Seller's present or former employees which Purchaser elects to hire, if any, will be deemed to constitute "new hires" of Purchaser.

**Section 2.9    Permits.**  With respect to any Permits and/or consents which are required for Purchaser's acquisition and usage of the Acquired Assets, Seller hereby agrees to use its best efforts to assist Purchaser in obtaining all such Permits and consents.

## ARTICLE III
## CLOSING

**Section 3.1    Closing.**  Upon the terms and conditions set forth herein and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "Closing") shall be

{01498055.DOC;5 }

held at the offices of Karr Tuttle Campbell at 10:00 a.m. local time on the first Business Day fourteen (14) days after the date that the Bankruptcy Court enters the Sales Order, but in no event later than January 31, 2011, provided that the conditions set forth in Articles VII and VIII are satisfied. Notwithstanding the foregoing, the Closing may be held at such other time and place as is mutually agreeable to the parties. The date on which the Closing occurs shall be the "Closing Date."

**Section 3.2** **Actions at Closing**. At the Closing, Seller and Purchaser shall deliver and do (or cause to be delivered and done) the following:

(a) **Instruments and Possession**. Seller shall deliver to Purchaser:

(i) one or more bills of sale, in a form reasonably acceptable to Purchaser and Seller, conveying in the aggregate all of the owned personal property of Seller included in the Acquired Assets, duly executed by Seller;

(ii) Certificates of Title for all motor vehicles, including the Motor Coaches, for the purpose of changing the name of the legal owner to Purchaser;

(iii) a copy of the Sale Order;

(iv) all Books and Records and all other tangible Acquired Assets owned by or in the possession of Seller or Subsidiary (excluding any such items that are Excluded Assets);

(v) an assignment and assumption agreement in the form attached hereto as Exhibit B, which provides for the assignment and assumption of the Assumed Executory Contracts and the Assumed Liabilities, duly executed by Seller;

(vi) an assignment agreement in the form attached hereto as Exhibit C, which assigns the MTR Intellectual Property, including trademarks, service marks and trade names, duly executed by Seller;

(vii) such other documents as Purchaser may reasonably request.

(b) **Payment.** Purchaser shall cause the Deposit Agent to release the Deposit and shall deliver to Seller the balance of the Purchase Price by wire transfer at Closing in immediately available funds to the account that Seller designates in writing not less than one (1) Business Day prior to Closing.

(c) **Form of Instruments.** To the extent that a form of any document to be delivered hereunder is not attached as an exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Purchaser and Seller.

**Section 3.3** **Transaction Expenses.** Except as expressly provided by this Agreement (including with respect to the Break-Up Fee payable by Seller in accordance with Section

10.2(d)), each party shall bear its own costs and expenses, including attorney, accountant and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

### Section 3.4    Prorations.

(a)    **Personal Property Taxes; Motor Vehicle Licenses and Registration.** Personal property taxes and motor vehicle license/registration fees associated with the Acquired Assets (the "Personal Property Taxes") that are imposed on a periodic basis and are payable for a tax period that includes (but does not end on) the Closing Date shall be prorated as of the Closing Date, and Seller shall bear the proportion of, and shall have the sole responsibility for, such taxes equal to a fraction, the numerator of which is equal to the number of days which shall have elapsed from the beginning of the applicable tax period to the Closing Date and the denominator of which is the number of days in the entire applicable tax period, and Purchaser shall be responsible for the remainder.

(b)    **Real Property and Similar Taxes.** The real property taxes and assessments including, without limitation, commercial rent taxes, ad valorem, sewer rents, business improvement district, license, intangibles and other similar taxes (including any similar personal property taxes) (the "Real Property Taxes") required to be paid Seller pursuant to the Leases shall be prorated as of the Closing Date between Purchaser and Seller as follows:  Seller shall bear the proportion of, and shall have the sole responsibility for, such taxes equal to a fraction, the numerator of which is equal to the number of days which shall have elapsed from the beginning of the applicable tax period to the Closing Date and the denominator of which is the number of days in the entire applicable tax period and Purchaser shall be responsible for the remainder.

(c)    **Tax Responsibility.**  Unless otherwise provided to the contrary herein and subject to Section 11.5, Purchaser shall be solely responsible for Taxes relating to the Acquired Assets applicable to or arising from the period from and after the Closing Date, and the Seller shall be solely responsible for Taxes relating to Acquired Assets applicable to or arising prior to the Closing.

(d)    **Prorations Generally.**

(i)    Any and all other payments, receipts, rentals, costs, charges, fees or expenses connected with or used in the operation of the Acquired Assets, including costs under the Assumed Executory Contracts or revenues from the Acquired Assets, shall be prorated between Purchaser and Seller prior to the Closing Date and Seller shall bear its proportion thereof through the day prior to the Closing Date. For purposes of determining the costs under the Customer Contracts, only fuel and driver costs shall be included (no overhead or general and administrative costs shall be included).

(ii)    If any of the items described above cannot be finally apportioned at the Closing because of the unavailability of the amounts which are to be apportioned or otherwise, or are incorrectly apportioned at Closing or subsequent thereto, such items shall be apportioned or reapportioned, as the case may be, as soon as practicable after the Closing or the

{01498055.DOC;5 }

date such error is discovered or the event giving rise to an apportionment or reapportionment occurs, as applicable. For purposes of calculating prorations, Seller shall be deemed to have title to the Acquired Assets up to but not including the Closing. All such prorations shall be made on the basis of the actual number of days of the year and month which shall have elapsed as of the Closing.

### Section 3.6  Indemnification

(a)  Seller's Indemnification. Seller hereby covenants and agrees, from and after the Closing, to indemnify and to hold harmless Purchaser and its officers and directors, employees and agents (collectively, the "Purchaser Indemnified Party") from and against all claims, losses, liabilities, damages, fines, penalties, taxes, costs and expenses, reasonable fees and disbursements of counsel, including counsel fees incurred to enforce its rights hereunder, (net in all cases of any benefits paid to an Indemnified Party by an insurance carrier in respect of any loss, liability, obligation, damage, deficiency or expense) (collectively, the "Losses"), sustained or incurred by the Purchaser Indemnified Party as follows: (i) all Losses sustained or incurred by any Purchaser Indemnified Party in respect of any Unassumed Liabilities; (ii) all Losses sustained or incurred by any Purchaser Indemnified Party resulting from any breach of any representation or warranty on the part of Seller under this Agreement; (iii) all Losses sustained or incurred by any Purchaser Indemnified Party resulting from any breach of Seller's covenants or agreements contained herein; (iv) all Losses sustained or incurred by any Purchaser Indemnified Party resulting from the Acquired Assets not including all of the assets needed for Purchaser to operate a motor coach fleet for charter business in a manner comparable to Seller's Business prior to Closing; and (v) all Liabilities and Losses arising from third party claims in any way connected to the ownership, use or operation of the Acquired Assets for the entire period of Seller's ownership prior to the date on which such Acquired Assets were transferred to Purchaser.

(b)  Purchaser's Indemnification. Purchaser hereby covenants and agrees, from and after the Closing, to indemnify and to hold harmless Seller and its officers, directors, employees and agents (collectively, the "Seller Indemnified Party") from and against all Losses sustained or incurred by the Seller Indemnified Party as follows: (i) all Losses sustained or incurred by any Seller Indemnified Party in respect of any Assumed Liabilities; (ii) all Losses sustained or incurred by any Seller Indemnified Party resulting from any breach by Purchaser of any of its representations or warranties; (iii) all Losses sustained or incurred by any Seller Indemnified Party resulting from any breach of any of Purchaser's covenants or agreements contained herein; and (iv) all Liabilities and Losses in any way connected to the ownership, use or operation of the Acquired Assets for the entire period succeeding the date on which such Acquired Assets, or any of them, were transferred to Purchaser.

(c)  Claims. Any claim by Purchaser or Seller for indemnification based on this Section 3.5 must be made, if at all, within eighteen (18) months following the Closing. In addition to any other remedy, Purchaser shall be entitled, but shall not be obligated, to offset all such claims for Losses against any obligation of Purchaser to Seller including, without limitation, payments of the Earn-Out Payment pursuant to Section 2.6(a)(ii). No Indemnified Party shall be entitled to indemnification for any Losses, unless the aggregate amount of all such

Losses exceeds TEN THOUSAND DOLLARS ($10,000) (the "Floor Amount"), in which case such any Indemnified Person will be entitled to indemnification for all amounts including the Floor Amount.

      **Section 3.7    Damage.**  The risk of destruction, loss or damage by fire or other casualty to any of the Acquired Assets between the date hereof and Closing (a "Damage") shall be treated as follows:  In the event that there is uninsured Damage to any of the Acquired Assets the estimated cost of repair for which exceeds $50,000, Purchaser may, at its election, either (i) terminate this Agreement as to such Acquired Asset, in which event the Purchase Price shall be reduced by the amount of the loss, or (ii) elect to include such Acquired Asset in the Acquired Assets, in which event Seller shall pay to Purchaser at the Closing the estimated cost for the repair of the Damage based on a construction bid reasonably acceptable to Purchaser.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

      As an inducement to Purchaser to enter into this Agreement, each Seller Entity represents and warrants to Purchaser that, as of the date hereof and as of Closing:

      **Section 4.1    Organization and Authorization.**  Such Seller Entity is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the State or Canadian Province indicated in the Preamble.  Subject to the entry of the Sale Order for each Seller Entity which is a Chapter 11 debtor, (i) this Agreement has been duly executed and delivered by such Seller Entity and is a valid and binding obligation of such Seller Entity, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)), and (ii) each agreement or instrument which has been or shall be entered into or executed and delivered by such Seller Entity in connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by such Seller Entity, and is (or will be when authorized, executed and delivered) a valid and binding obligation of such Seller Entity, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

      **Section 4.2    No Violation.**  Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order as to each Seller Entity which is a Chapter 11 debtor, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by such Seller Entity do not and shall not (i) conflict with or result in any breach of any of the terms, conditions or provisions of, (ii) constitute a default under, (iii) result in a violation of, (iv) give any Third Party the right to modify, terminate or accelerate any obligation under, (v) result in the creation of any Lien upon any of the Acquired Assets or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental

{01498055.DOC;5 }

Authority, under the provisions of the articles of incorporation, by-laws or other constitutive documents of such Seller Entity.

**Section 4.3     Subsidiaries.**  Seller Entities do not own any subsidiaries or hold, directly or indirectly, any stock, partnership interest joint venture interest, or other security or interest in any Person.

**Section 4.4     Governmental Consents and Approvals.**  Except for the Sale Order, to Seller's knowledge, there are no consents, waivers, agreements, approvals, permits or authorizations of, or declarations, filings, notices or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except where the failure to so obtain would not be reasonably expected to have a Material Adverse Effect.  In addition, Seller represents that to the extent necessary, it has given all required notices under the WARN Act.

**Section 4.5     Title to Assets**

**(a)**     Except as set forth on <u>Schedule 4.5 (Exceptions to Asset Title Warranty)</u> attached hereto, Seller has good and marketable title to, lawful ownership of, or a valid leasehold interest in, the Acquired Assets, free and clear of Liens, Claims and encumbrances of any kind whatsoever.

**(b)**     Except as set forth on <u>Schedule 4.5</u> and subject to Bankruptcy Court approval, Seller has the power and the right to sell, assign and transfer and Seller will sell and deliver to Purchaser, and upon consummation of the transactions contemplated by this Agreement Purchaser will acquire, good and marketable title to the Acquired Assets free and clear of all Liens, Claims and encumbrances of any kind whatsoever.

**(c)**     To Seller's Knowledge, the Seller has caused the Acquired Assets, including the Motor Coaches, to be maintained in accordance with good business practice, and such assets are in good condition and working order, with the exception of normal wear and tear that occurs in the ordinary course of business, and are suitable for the purposes for which they are used and intended.

**Section 4.6     Legal Compliance.**  As to the Acquired Assets, Seller has complied in all material respects, and is in material compliance, with all applicable laws, ordinances, rules, requirements and regulations of foreign, federal, state and local governments and agencies thereof relating to the ownership of the Acquired Assets.  Seller has complied with all laws, ordinances, rules, requirements and regulations relating to data protection and/or privacy, and no notices have been received by, and no claims have been filed against, Seller alleging a violation of any such laws, ordinances, rules, requirements or regulations.

**Section 4.7     Contracts.**     <u>Schedule 4.7</u> lists each Existing Contract and Seller has delivered to Purchaser a correct and complete copy of each such Existing Contract.  Except as set forth in <u>Schedule 4.7</u> with respect to each such Existing Contract:  (A) the agreement is legal, valid, binding, enforceable, and in full force and effect; (B) subject to entry of the Sale Order, the

{01498055.DOC;5 }

agreement will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby; (C) except to the extent cured by Seller in conjunction with assignment to Purchaser, no party is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default or permit termination, modification, or acceleration, under the agreement, or if such breach has occurred, it will not have been cured by Closing under Section 365 of the Bankruptcy Code; and (D) no party has repudiated any provision of the agreement or given notice that the agreement has terminated or will be terminating.

Section 4.8    Litigation.  To Seller's knowledge, except as set forth in Schedule 4.8 (Litigation), there is no action, suit, claim, arbitration, grievance, complaint, charge or proceeding pending against, or to Seller's knowledge, threatened against Seller or Subsidiary before any court or arbitrator or any government agency (a) with respect to the Acquired Assets or Seller's Business or (b) which seeks to prevent, enjoin, alter or materially delay the execution and delivery this Agreement and any related documents thereto, to carry out Seller's obligations hereunder and thereunder, and to consummate the transaction contemplated hereby and thereby. Attached hereto as Schedule 4.8 is a true and complete list of all pending actions and judgments against Seller.

Section 4.9    Investment Bank/Brokers.  Seller has not incurred any liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

Section 4.10   Real Property.  Seller does not own any real property.

Section 4.11   Intellectual Property.  All Intellectual Property used in Seller's Business is, to Seller's knowledge, owned by Seller, or licensed to Seller. To Seller's Knowledge, Seller's Intellectual Property does not violate any license or infringe upon any intellectual property rights of any Person.  To Seller's Knowledge, the Seller has not received any communication alleging that the Seller has violated or, by conducting its business as currently conducted or proposed to be conducted, would violate any of the intellectual property rights of any Person.

Section 4.12   As Is.  Except as expressly set forth herein, the Acquired Assets are sold "As Is, Where Is", and except for the representations and warranties set forth in this Article IV, no other representation or warranty is made or implied hereby, including a warranty of fitness for a particular purpose, a warranty of merchantability, or otherwise.

Section 4.13  Taxes.  None of the Seller Entities have filed, within the times and within the manner prescribed by law, all federal, provincial, state and local tax returns and tax reports which are required to be filed by, or with respect to such entity for at least two years. Seller makes no representation that returns and reports filed for prior periods reflect accurately all liability for taxes of each Seller entity for the periods covered thereby.  All federal, provincial, state and local income, profits, sales, use, occupancy, excise and other taxes, assessments and reassessments (including interest and penalties) payable by, or due from, each Seller entity have not necessarily been fully paid or adequately disclosed and fully provided for on Schedule 4.13 or adequately disclosed in the books and records of Seller.  To the Seller's knowledge there are no actions, suits or other proceedings or investigations or claims in progress, pending or, to

{01498055.DOC;5 }

Seller's Knowledge, threatened against any of the Seller Entities in respect of any taxes, governmental charges or assessments and, in particular, there are no currently outstanding reassessments or written enquiries which have been issued or raised by any governmental authority relating to any such taxes, governmental charges and assessments that are not otherwise going to be paid out of the funds comprising the Purchase Price as part of the administration of Seller's bankruptcy cases. Each Seller entity has withheld and remitted all amounts required to be withheld and remitted by them in respect of any taxes, or will remit such amounts promptly after Closing. For all time periods since Trustee's appointment, proper and accurate amounts have been and will be withheld by each Seller entity from its employees for all periods in complete compliance with all requirements of law and such withholdings have and will be timely paid to the appropriate Governmental Authorities, in each case, except to the extent that failure to so withhold or pay such amount would not reasonably be expected to have a material adverse effect on the Seller's Business.

SECTION 4.14    **Ownership; Location.**  To Seller's Knowledge, the bankruptcy estate of Frederick D. Berg in the Washington Bankruptcy Court pending under case number 10-18668-KAO is the sole equity holder of each of the Seller Entities. There are no outstanding rights to purchase options, warrants or similar rights or agreements pursuant to which Seller may be required to issue, sell or purchase any stock or other equity security. The current locations of each Seller Entity's executive offices, principal place of business, corporate offices, all warehouses and premises within which any of the Acquired Assets (other than the Motor Coaches) is stored or located, and the locations of each Seller entity's records concerning the Acquired Assets are set forth in Schedule 4.15.

SECTION 4.15    **Insurance.**  All policies of insurance of any kind or nature owned by or issued to the Borrower, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect in accordance with the terms of any such policies.

SECTION 4.16    **Labor Matters.**    There are no strikes or other material labor disputes against Borrower that are pending or, to Seller's Knowledge, threatened. Seller has no obligation under any collective bargaining agreement, management agreement, or any employment agreement.

SECTION 4.17    **ERISA.**  Seller has no plans subject to ERISA. Employees are enrolled in the benefit plans of Seller's affiliate set forth on Schedule 4.18, which plan may be subject to ERISA.

SECTION 4.18    **Hazardous Materials.**  Seller is not subject to any Liabilities related to environmental laws rules or regulations of any Governmental Authority ("Environmental Laws"), and to Seller's Knowledge, no notice has been received by the Seller identifying it as a "potentially responsible party" or requesting information under any Environmental Laws, and to Seller's Knowledge, there are no facts, circumstances or conditions that would reasonably be expected to result in the Seller being identified as a "potentially responsible party" under any Environmental Laws. To Seller's Knowledge, Seller has conducted its business in compliance with all Environmental Laws.

{01498055.DOC;5 }

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement, Purchaser represents and warrants to Seller that:

**Section 5.1    Organization.**  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Washington.

**Section 5.2    Authorization.**  Purchaser has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other company proceedings on the part of Purchaser are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Purchaser and is a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by applicable bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).  Each agreement or instrument which has been or shall be entered into or executed and delivered by Purchaser in connection with the transactions contemplated hereby has been (or will be) duly authorized, executed and delivered by Purchaser, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and similar laws affecting creditors' rights and remedies and by general principles of equity (regardless of whether enforcement is sought at law or in equity)).

**Section 5.3    Governmental Consents and Approvals.**  To Purchaser's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby or thereby.

**Section 5.4    No Violation.**  The execution and delivery of this Agreement and the other agreements specified herein and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational documents of Purchaser or (ii) conflict with or violate any statute or law, or any judgment, decree, order, regulation or rule of any court or governmental authority, binding upon or applicable to Purchaser or by which the property or assets of Purchaser are bound or affected.

## ARTICLE VI.
## ADDITIONAL COVENANTS

**Section 6.1    Maintenance of Assets.**  After the date hereof Seller shall, to the extent permitted by the bankruptcy Court and consistent with its ordinary course of business but

{01498055.DOC;5 }

without any obligation to discharge Pre-Petition Obligations, consistent with such obligation and without limiting Seller's obligations, Seller shall (a) maintain the motor coaches in the same manner as Seller maintained the motor coaches in the year prior to the Petition Date, excepting normal wear and tear, (b) maintain its relationships with MTR Employees, suppliers, vendors and Customers, including without limitation, performing its obligations as required under MTR Customer agreements, (c) comply with all requirements of Governmental Authorities in connection with Seller's Business, (d) enforce its historical security and anti-theft policies, and (e) maintain the insurance covering the Acquired Assets.

**Section 6.2    Access to Information and Facilities; Communication with Parties to Existing Contracts.**    Seller shall allow Purchaser and its Representatives to make such inspection of the Acquired Assets, and during Seller's normal business hours to inspect and make copies of contracts, Books and Records and all other documents and information requested by Purchaser and related to the Acquired Assets or Seller's Business, including access to Seller's employees, upon reasonable advance notice, but in no event less than two (2) days advance notice; provided, however, that any such party shall be bound by a nondisclosure agreement in customary form.    Upon Seller's written consent, Purchaser may communicate with all Customers, suppliers. lessors, lenders, vendors and other parties to Existing Contracts with Seller for the purpose of renegotiating Existing Contracts or establishing new agreements with such parties to be effective upon Closing.

**Section 6.3    Further Assurances**

Seller shall execute such documents and use its reasonable best efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including, without limitation, to put Purchaser in actual possession and operating control of the Acquired Assets, to effectuate, record or perfect the transfer of the Acquired Assets to Purchaser, to confirm the title of the Acquired Assets in Purchaser, to assist Purchaser in exercising rights relating thereto, to obtain all consents, approvals and authorizations of Third Parties, to make all filings with and give all notices to Third Parties which may be necessary or required in order to effectuate the transactions contemplated hereby); provided, however, that the foregoing shall not require Seller to make any payments to any party.  Seller shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Article VII of this Agreement.  The obligations of Seller set forth in the first sentence of this Section 6.3(b) shall survive the Closing.

**Section 6.4    Bankruptcy Actions**

(a)    Seller will use its reasonable best efforts to obtain the entry of the Bidding Procedures Order by the Bankruptcy Court as soon as practicable upon such notice as is approved by the Bankruptcy Court.  Seller will use its reasonable best efforts to timely obtain any other consent required for the consummation of the transactions contemplated by this Agreement as soon as practicable.

(b)    Within three (3) Business Days of the date of this Agreement, Seller shall file with the Bankruptcy Court a motion, in a form reasonably acceptable to Purchaser, seeking entry of the Bidding Procedures Order and to approve the transactions contemplated by this

{01498055.DOC;5 }

Agreement ("Sale Motion"), which motion shall seek the Bankruptcy Court's approval of this Agreement and Seller's performance under this Agreement.

(c)     Within three (3) days of the date Purchaser notifies Seller of which Existing Contracts it wishes to assume, Seller shall file with the Bankruptcy Court a motion, in a form reasonably acceptable to Purchaser, (which may be included in the Sale Motion) for an order authorizing the assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Assumed Executory Contracts (the "Assignment Motion").  The Existing Contracts shall be identified on an exhibit to the Assignment Motion.  Such exhibit shall set forth any estimated amounts necessary to cure defaults under each of such Assumed Executory Contracts, if any, as determined by Seller based on the Books and Records.  Seller shall, at the written direction of Purchaser, provide the Bankruptcy Court and parties to Existing Contracts, notice of Purchaser's intent to assume specified Existing Contracts at such time as Purchaser so informs Seller pursuant to Section 2.2(a).  In cases in which Seller does not believe that a default exists, the relevant cure amount shall be set at $0.00.  The Assignment Motion shall reflect that Purchaser's promise to perform from and after the Closing under the Assumed Executory Contracts and shall be the only adequate assurance of future performance necessary to satisfy the requirements of Section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of such Assumed Executory Contracts, provided, however, Purchaser shall provide whatever reasonable financial or other information the Bankruptcy Court may require to make such a determination.

(d)     Upon the Bankruptcy Court's entry of an order setting the date for hearing on the Sale Motion and Assignment Motion, the Seller shall provide appropriate notice of the hearing on the Sale Motion and Assignment Motion as is required by the Bankruptcy Code and Rules to all parties entitled to notice, including, but not limited to, all parties to Assumed Executory Contracts (and to the individuals listed for notice purposes in each Assumed Executory Contract), all taxing and environmental authorities in jurisdictions applicable to Seller, and as otherwise required by such Bankruptcy Court order.

**Section 6.5     Exclusivity; No Solicitation of Transactions.**  Seller represents that, other than the transactions contemplated by this Agreement, Seller is neither a party to nor bound by any agreement providing for a merger, sale, restructuring, refinancing or other disposition of all or any material part of Seller's Business or the Acquired Assets.  Purchaser acknowledges that Seller has a continuing duty, as Debtor-in-Possession in its pending Bankruptcy Case, to provide notice of this Agreement, pending sale, and Bidding Procedures Order to any and all parties (i) required under the Bankruptcy Court's order setting the date for hearing on the Sale Motion and Assignment Motion, (ii) that have been previously contacted by the Company as potential Purchasers of some or all of the Acquired Assets, (iii) requesting information and copies of the Bidding Procedures Order; and Seller shall have the right to do so.

**Section 6.6     Other Bids.**  Purchaser acknowledges that Seller will be entitled to solicit bids ("Bids") from other prospective purchasers (collectively, "Bidders") for the sale of all or substantially all of the Acquired Assets on terms and conditions substantially the same as set forth in this Agreement and in accordance with the procedures set forth in the Bidding Procedures Order. Upon receipt from any such Bidders of an executed confidentiality and non-

disclosure agreement ("NDA") in the form attached hereto as Exhibit D, the Seller shall be free to comply with such Bidder's due diligence requests, including providing confidential information covered by such NDA.

**Section 6.7      Continued Effectiveness of Representations and Warranties**.  From the date hereof through the Closing Date, except as otherwise expressly contemplated by this Agreement, Seller shall use commercially reasonable efforts to cause the representations and warranties made in this Agreement to continue to be true and correct in all material respects on and as of the Closing Date as if made on and as of the Closing Date.  Seller shall promptly notify Purchaser and Purchaser shall promptly notify Seller of any event, condition or circumstance occurring from the date hereof through the Closing Date that would constitute a material violation or breach of any of the respective representations or warranties made by Seller contained in this Agreement if made on such date.

**Section 6.8      Public Announcements**.  Except as otherwise required by law as advised by counsel, the parties will consult with each other and cooperate with respect to the text of any press release or any other public statement, in each case relating to or connected with or arising out of this Agreement or the transactions contemplated hereby.

**Section 6.9      Confidentiality**.  Purchaser acknowledges executing an NDA in the form attached as Exhibit D, the terms of which remain in full force and effect and survives execution of this Agreement and which are incorporated herein by this reference.

## ARTICLE VII.
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Seller in accordance with Section 11.4 herein.

**Section 7.1      Section Covenants and Representations.**      The representations and warranties of Purchaser contained in Article V hereof which are not qualified as to materiality (or Material Adverse Effect) shall be true and correct in all material respects and the representations and warranties of Purchaser contained in Article V hereof which are qualified as to materiality (or Material Adverse Effect) shall be true and correct in all respects, in each case as of the Closing Date, as though made on such date (except that representations and warranties that speak as of a specific date need be true and correct only as of such date), and the Purchaser shall have performed in all material respects all of the covenants, agreements and conditions required by this Agreement to be performed, satisfied and complied with by it hereunder on or prior to the Closing.

**Section 7.2      Litigation.**  No action, suit or other proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction.

{01498055.DOC;5 }

**Section 7.3** **Bankruptcy Condition.** Each of the Sale Order and the Bidding Procedures Order shall have been entered on the Bankruptcy Court's docket by the Clerk of the Bankruptcy Court and shall not have been stayed or subject to any stay.

**Section 7.4** **Deliveries.** On or prior to the Closing Date, Purchaser has delivered to Seller all of the following:

**(a)** a certificate from Purchaser in a form reasonably satisfactory to Seller, dated the Closing Date, stating that the conditions specified in Section 7.1 herein have been satisfied;

**(b)** copies of the resolutions of Purchaser's manager approving the transactions contemplated by this Agreement;

**(c)** the Required Diligence Notice described in Section 8.3 hereof;

**(d)** the Purchase Price in accordance with Section 3.2(b) hereof.

## ARTICLE VIII.
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to purchase the Acquired Assets and to consummate the transactions contemplated hereby are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by Purchaser in accordance with Section 11.4 herein:

**Section 8.1** **Representations and Warranties.** The representations and warranties of Seller contained in Article IV hereof which are not qualified as to materiality (or Material Adverse Effect) shall be true and correct in all material respects and the representations and warranties of Seller contained in Article IV hereof which are qualified as to materiality (or Material Adverse Effect) shall be true and correct in all respects, in each case as of the Closing Date, as though made on such date (except that representations and warranties that speak as of a specific date need be true and correct only as of such date), except where the failure of such representation and warranty to be so true and correct has not had and would not reasonably be expected to have a Material Adverse Effect.

**Section 8.2** **Covenants and Agreements.** The Seller shall have performed in all material respects all of the covenants, agreements and conditions required by this Agreement to be performed, satisfied and complied with by it hereunder on or prior to the Closing.

**Section 8.3** **Due Diligence.** Purchaser shall have the right and ability to conduct such further due diligence and reviews of all aspects of the business, assets, affairs and prospects of the Seller, including without limitation a review of MTR Employees, Customers and the financial and tax impacts of the transaction contemplated herein, for a period of sixty (60) days from execution of this Agreement or the period from execution of this Agreement until the date one day before the Auction, if earlier ("Diligence Period"). The results of such due diligence shall be satisfactory to Purchaser in its sole discretion, and Purchaser shall have notified Seller,

{01498055.DOC;5 }

in writing, that this condition has been satisfied. If no such written notification of satisfactory due diligence has been provided by the end of the Diligence Period ("Required Diligence Notice"), then this condition shall be deemed unsatisfied.

**Section 8.4     Bankruptcy Condition.**     Each of the Sale Order and the Bidding Procedures Order, both in forms reasonably acceptable to Purchaser and which, shall have been entered on the Bankruptcy Court's docket by the Clerk of the Bankruptcy Court and shall not have been stayed or subject to any stay.

**Section 8.5     Litigation.**  No action, suit or other proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain damages in respect thereof, or involving a claim that consummation thereof would result in the material violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction.

**Section 8.6     Material Adverse Change.**  Since the date of this Agreement, there shall not have been a Material Adverse Change with respect to the Acquired Assets.

**Section 8.7     Approvals.**  All authorizations, consents, filings and approvals necessary to permit Seller to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

**Section 8.8     Cure Costs.**  Seller shall have paid or otherwise provided for all cure obligations (pursuant to Section 365 of the Bankruptcy Code) with respect to the Assumed Executory Contracts.

**Section 8.9     Consents to Assignment.**   All consents to assignment deemed by Purchaser to be required or advantageous to Purchaser in connection with the transfer of the Assumed Executory Contracts shall have been received in a form acceptable to Purchaser in its sole discretion.

**Section 8.10   Negotiation of Contract Amendments or New Agreements.**  Purchaser shall have renegotiated or agreed to terms with Third Parties, including without limitation ABC Bus Leasing, Inc.. ABC Bus, Inc. and Wells Fargo Equipment Finance, with respect to Existing Contracts which Purchaser may assume. Such renegotiations or new terms shall be acceptable to Purchaser in its sole discretion and shall be completed no later than the end of the Diligence Period.

**Section 8.11   Transfer of OCW Assets.**   Oregon Coachways, Inc. ("OCW") shall have (i) transferred ownership to Seller the following motor coaches:

(i)        Prevost X3-45; VIN No. 2PCG334979C729599; and

{01498055.DOC;5 }

and (ii) presented modified certificates of title to the State of registration for such motor coaches to reflect the transfer of ownership.

**Section 8.12  Employees.**  Purchaser shall be satisfied in its discretion that a sufficient number of Key Employees and other MTR Employees will accept employment with Purchaser in order to efficiently operate the business formed with the Acquired Assets no later than the end of the diligence period and provide written notice to Seller of satisfaction of this condition in the Required Diligence Notice.

**Section 8.13  Motor Coaches.**  Purchaser shall have completed an evaluation of the Motor Coaches by itself or through a Third Party no later than the end of the Diligence Period and provide written notice to Seller of satisfaction of this condition in the Required Diligence Notice.  The results of such evaluation shall be satisfactory to Purchaser in its sole discretion. All Motor Coaches listed on Schedule 2.1(l) shall be transferable at Closing to Purchaser.

**Section 8.14  DIP Credit Agreement.**  There shall not have been an Event of Default (as defined in the DIP Credit Agreement) pursuant to the DIP Credit Agreement prior to Closing and/or Purchaser shall not have denied a Request for Funding (as defined in the DIP Credit Agreement) to Seller under the DIP Credit Agreement prior to Closing.

**Section 8.15  Deliveries.**  On or prior to the Closing Date, Seller shall have delivered to Purchaser all of the following:

(a)     a certificate in a form reasonably satisfactory to Purchaser, dated the Closing Date, stating that the conditions specified in Section 8.1, Section 8.2 and Section 8.5 have been satisfied as of the Closing;

(b)     copies of the resolutions of each Seller Entities' shareholders and boards of directors approving the transactions contemplated by this Agreement; and

(c)     the documents and instruments called for in Section 3.2(a) hereof.

**Section 8.16  Timing of Closing.**  Closing shall have occurred on or before January 31, 2011.

**Section 8.17  Permit Transfer.**  The Seller Entities hold certain operating rights and permits granted by the U.S. Federal Motor Carrier Safety Administration, other similar Governmental Authorities that regulate the business of Sellers in the states of California, Oregon and Washington, and other similar Governmental Authorities that regulate the business of Sellers in Canada, Alberta, and British Columbia that are necessary for the operation of Seller's Business.  Seller shall (i) take all reasonably necessary steps to transfer such permits and operating rights to Purchaser at Closing, (ii) assist Purchaser with all filings or other applications reasonably necessary to effect such transfers, and (iii) assist Purchaser with the filings and other applications reasonably necessary for Purchaser to acquire such operating rights and permits in the event that such operating rights and permits cannot be transferred to Purchaser.  After filing

{01498055.DOC;5 }

all required applications for transfer of such permits and operating rights, all time periods during which the applicable Governmental Authority can reject or condition the transfer shall have passed.

## ARTICLE IX.
## POST-CLOSING COVENANTS

**Section 9.1    Access to Books and Records.**    Inasmuch as certain of the Seller's books, records and documents are to be included in the Acquired Assets, and certain other of the Seller's books, records and documents may be retained by the Seller, and Purchaser or Seller may have need to have access to the books, records and documents held by the other after the date hereof, Purchaser and Seller agree that each shall maintain (or shall provide for a designated representative to maintain) for at least three (3) years after the Closing (or for such longer period as may be required by applicable law) the respective books, records and documents sold or retained hereunder relating to the Acquired Assets covering periods on or prior to the Closing. During such two (2) year period, subject to the confidentiality rights of third parties, representatives of Purchaser shall be permitted to inspect and make copies of any of such books, records, and documents retained by Seller during normal business hours and upon reasonable notice for any reasonable business purpose, such as for landlord audits or any other audit of Purchaser reasonably requiring the availability of such files or records.  During such two (2) year period, subject to the confidentiality rights of third parties, representatives of Seller shall be permitted to inspect and make copies of books, records and documents sold to Purchaser hereunder during normal business hours and upon reasonable notice for any reasonable business purpose, such as for landlord audits or any other audit of Seller reasonably requiring the availability of such files or records.

## ARTICLE X.
## TERMINATION; TERMINATION PAYMENT

**Section 10.1    Termination.**  This Agreement may be terminated prior to the Closing:

(a)    At any time by mutual written consent executed by both Purchaser and Seller;

(b)    by Purchaser, at any time prior to Closing, in the event of the failure of any condition to closing set forth in Article VIII (including notice to Seller that a condition to closing which is satisfied only in Purchaser's discretion will not be satisfied), or the entry by the Bankruptcy Court of an Order (i) denying the Seller's motion to approve the Bidding Procedures Order or the Sale Order, or (ii) approving any Acquisition Proposal with a Person(s) other than Purchaser;

(c)    by Seller if any event occurs which renders satisfaction of one or more of the conditions to Seller's obligations set forth in Article VII with respect to the Closing impossible, including failure of Purchaser to deliver the Required Diligence Notice identified in Section 8.3 hereof within the time required in Section 8.3;

{01498055.DOC;5 }

**(d)** by either Purchaser or Seller, by giving written notice of such termination to the other party, if such other party shall breach any of its material representations, covenants or agreements under this Agreement which would result in a failure of the conditions set forth in Sections 8.1 or 8.2, in the case of a termination by Purchaser, and the conditions set forth in Section 7.1, in the case of a termination by Seller, and in the case of covenants and agreements only such breach has not been cured within ten (10) days following the giving of written notice of such breach by the non-breaching party to the breaching party.

**Section 10.2 Remedies.** In the event of termination of this Agreement pursuant to Section 10.1:

**(a)** each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby which contain confidential information delivering party, whether obtained before or after the execution hereof, to the party furnishing the same;

**(b)** no confidential information received by any party with respect to the business of any other party or its Affiliates shall be disclosed to any Third Party, unless required by law;

**(c)** all obligations of the parties hereto under this Agreement shall terminate and there shall be no liability of any party hereto to any other party and, except for Seller's obligation to pay the Break-Up Fee, each party hereto shall bear its own expenses incurred in connection with the negotiation, preparation, execution and performance of this Agreement; provided that the foregoing shall not relieve a party of liability for damages actually incurred by the other party as a result of any breach of this Agreement by such party;

**(d)** Except as set forth in Section 10.2(f), the Deposit Agent shall return the Deposit to the Purchaser within one (1) Business Day of the date of termination.

**(e)** if the termination is by Purchaser pursuant to Section 10.1(b) because the Bankruptcy Court has approved the sale of all or part of the Acquired Assets by sale, merger, transfer of equity interests of Seller and whether in one or more transactions to a Person(s) other than Purchaser, Seller shall pay Purchaser in cash, at the Closing of such transaction and prior to disbursement of Seller's funds to any third party including a secured creditor, the Purchaser's reasonable and actual expenses incurred in connection with this transaction up to $300,000.00 ("Break-Up Fee"), which shall constitute an administrative expense of the Seller's bankruptcy estate pursuant to 11 U.S.C. § 503(b).

**(f)** if the termination is by Seller due to Purchaser's failure to close when (i) Seller is in material compliance of all of the terms and conditions of this Agreement and (ii) all of Purchaser's Conditions to Closing set forth in Article VIII have been satisfied or waived by Purchaser, then Seller's sole remedy shall be to ask the Bankruptcy Court for an order instructing the Deposit Agent to pay Seller the Deposit as liquidated damages on account of Purchaser's breach, with all parties hereby acknowledging that the amount of the Deposit is a reasonable estimate of the damages (and not a penalty) that may be caused Seller on account of such breach (the precise measure of which would otherwise be impossible); otherwise, the Deposit Agent

{01498055.DOC;5 }

shall return the Deposit to the Purchaser within one (1) Business Day of the date of termination; and

        **(g)**     Seller's obligation to pay the Break-Up Fee pursuant to Section 10.2(e) above and the Deposit Agent's obligation to return the Deposit to Purchaser pursuant to Section 10.2(d) or deliver it to Seller as provided in Section 10.2(f) shall survive termination of this Agreement.

       **Section 10.3  Effect of Termination or Breach.**  If the transactions contemplated hereby are not consummated this Agreement shall become null and void and of no further force and effect, except for the obligations of the Parties contained in this Section 10.3 and in Section 10.2(d), 10.2(e) or 10.2(f) hereof, and except that the termination of this Agreement for any cause shall not relieve any party hereto from any liability which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination.

**ARTICLE XI.**
**MISCELLANEOUS**

       **Section 11.1  Assignment; Successors.**  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any party without the prior written consent of the other; provided, however, (i) Purchaser may assign some or all of its rights under this Agreement to any Affiliate of Purchaser without consent, so long as Purchaser remains liable for its obligations and (ii) Purchaser may assign its rights under this Agreement as collateral security to any lender providing Purchaser with acquisition financing. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, heirs, legatees, successors and permitted assigns, including without limitation any Chapter 11 trustee appointed in the Chapter 11 Case, and no other person shall have any right, benefit or obligation hereunder.

       **Section 11.2  Notices.**  All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given when received if personally delivered; when transmitted if transmitted by Fax or Email; the date after it is sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (*e.g.*, Federal Express); and upon receipt, if sent by certified or registered mail, return receipt requested.  Notices, demands and communications to the Seller and Purchaser shall be sent to the addresses indicated below:

        If to Purchaser:     GTO, LLC
                                Attn:  H.S. Wright III
                                1000 Dexter Ave. North, Ste. 502
                                Seattle, WA 98109
                                Email: hsw@shworldwide.com

                                With copies to:
                                Cairncross & Hempelmann PS
                                Attn: Robert Seidel

{01498055.DOC;5 }

524 Second Ave., Ste. 500
Seattle, WA
Fax: (206)254-4505
Email: RSeidel@Cairncross.com

If to Seller:     Diana K. Carey
                  1201 Third Avenue, Suite 2900
                  Seattle, Washington 98101
                  Email: dcarey@karrtuttle.com

With copies to:   Karr Tuttle Campbell
                  Attn: George Treperinas
                  1201 Third Avenue, Suite 2900
                  Seattle, WA 98101
                  Fax: 206-682-7100
                  Email: gtreperinas@karrtuttle.com

or to such other place and with such other copies as any party may designate by written notice to the others.

**Section 11.3   Choice of Law; Submission to Jurisdiction.**   This Agreement shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Washington.  Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each party at its address specified in Section 11.2.   The parties hereto irrevocably submit to the exclusive jurisdiction of the United States Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby and any such dispute shall be deemed to have arisen in the State of Washington.  Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts.   The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

**Section 11.4   Entire Agreement; Amendments and Waivers.**   This Agreement, together with all Exhibits and Schedules attached or to be attached hereto, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with regard to the subject matter hereof.  All amendments of this Agreement will only be effective if executed in writing by or on behalf of all parties.  No waiver of any of the provisions of this Agreement shall be effective unless made in a writing by the party making the waiver or be deemed or constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

{01498055.DOC;5 }

**Section 11.5  Construction.**  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto.  All Exhibits and Schedules attached are made a part hereof.  All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein.  All references in this Agreement to "this Agreement" shall be deemed to include the Exhibits and Schedules attached hereto.  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees.  The term "including" when used herein shall mean "including, without limitation."  Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

**Section 11.6  Third Party Beneficiaries.**  No Person other than the parties hereto, shall have any rights or claims under this Agreement, except as expressly provided in Section 2.6(c).

**Section 11.7  No Waiver.**  The failure of any party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of this Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform, nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

**Section 11.8  Multiple Counterparts/Signatures.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**Section 11.9  Delivery by Facsimile/Email.**  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine ("Fax") or by electronic mail ("Email"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the enforceability of a contract and each party forever waives any such defense.

**Section 11.10  Invalidity.**  In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the

{01498055.DOC;5 }

maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision, or any portion thereof, of this Agreement or any other such instrument.

**Section 11.11 Further Assurances.**  Without limiting any other rights or obligations of the parties contained in this Agreement, following the Closing, each party agrees to execute, or cause to be executed, such documents, instruments or conveyances and take such actions as may be reasonably requested by the other party to effectuate the purposes of this Agreement, including, without limitation, such instruments as shall be reasonably requested by Purchaser to vest in Purchaser title in and to the Acquired Assets in accordance with the provisions of this Agreement.

**Section 11.12 Cumulative Remedies.**  All rights and remedies of any party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

**Section 11.13 Currency.**  Except as otherwise expressly provided in this Agreement, all dollar amounts are stated in United States dollars.

**Section 11.14 Representation by Counsel; Mutual Negotiation.**  Each party has been represented by counsel of its choice in negotiating this Agreement.  This Agreement shall therefore be deemed to have been negotiated and prepared at the joint request, direction and construction of the parties, at arm's length, with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to any party.

**Section 11.15 Transfer Taxes.**  Any transfer, documentary, sales, use, excise, stamp, registration or other such taxes and fees (including any penalties and interest thereon) which shall be payable with respect to this Agreement or the sale of the Acquired Assets to Purchaser shall be the responsibility of Purchaser**.**

**Section 11.16 Consents to Assignment.**  Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assumed Executory Contract or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party thereto, would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder after taking into account the operation of the Bankruptcy Code.

**Section 11.17 Post-Closing Dispute Resolution.**  Any party may submit to the Bankruptcy Court any controversy, claim or dispute of whatever nature between the parties arising out of or relating to this Agreement after the Closing that is not resolved within thirty (30) days after written notice by one party to the other of such controversy, claim or dispute. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction to resolve such controversy, claim or dispute; provided, however, that upon the entry of a final decree in cases by the Bankruptcy Court, all disputes arising out of or relating to this Agreement (except as otherwise provided herein) shall be brought in a state or federal court located in either King County for state court matters and the Western District of Washington for federal court matters. The Bankruptcy Court shall award a party that prevails in full its reasonable attorneys' fees and

costs and shall award a party that prevails less than in full that portion of its reasonable attorneys' fees and costs as determined by the Bankruptcy Court.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the day and year first above written.

**[SIGNATURES ON FOLLOWING PAGE]**

**ASSIGNORS:**

Meridian Transportation Resources, LLC, a
Washington limited liability company, Meridian
Transportation Resources (California), LLC, a
California limited liability company, Meridian
Transportation Resources (Canada), Ltd., a a federal
corporation extraprovincially registered in British
Columbia, MTR Leasing, LLC, a Washington
limited liability company, Geogenius, LLC, a
Washington limited liability company

By: _____
    Diana K. Carey, in her capacity as President,
    Manager and/or Trustee of the Assignors


**ASSIGNEE:**

GTO, LLC, a Washington limited liability company


By: _____
    H.S. Wright III
Its: Manager

**[Signature Page to Asset Purchase Agreement]**

**SELLER ENTITIES:**

Meridian Transportation Resources, LLC, a
Washington limited liability company, Meridian
Transportation Resources (California), LLC, a
California limited liability company, Meridian
Transportation Resources (Canada), Ltd., a federal
corporation extraprovincially registered in British
Columbia, MTR Leasing, LLC, a Washington
limited liability company, Geogenius, LLC, a
Washington limited liability company

By: _____
     Diana K. Carey, in her capacity as President,
     Manager and/or Trustee of the Seller Entities

**PURCHASER:**

GTO, LLC, a Washington limited liability company

By: _____
     H.S. Wright III
Its: Manager

**List of Attached Schedules**

Schedule 2.1(b) – Tangible Personal Property

Schedule 2.1(l) – Motor Coaches

Schedule 2.1(m) – Other Assets

Schedule 2.7 – Allocation Schedule

Schedule 2.8 – Employee Information

Schedule 4.5 – Exceptions to Asset Title Warranty

Schedule 4.7 – Existing Contract List / Exceptions to Existing Contract Warranty

Schedule 4.8 – Litigation

Schedule 4.13 – Taxes

Schedule 4.15 – Location of Assets (other than Motor Coaches)

Schedule 4.20 – Customer Issues

**Exhibits**

Exhibit A – Proposed form of Bidding Procedures Order
Exhibit B – Form of Assignment and Assumption Agreement for Assumed Executory Contracts
           and the Assumed Liabilities
Exhibit C – Form of Assignment of MTR Intellectual Property
Exhibit D – Non-Disclosure Agreement
Exhibit F – Proposed form of Sale Order

Exhibit A

Proposed Form of Bidding Procedures Order

Exhibit B
Form of Assignment and Assumption Agreement for Assumed Executory
Contracts and the Assumed Liabilities

**Assignment and Assumption Agreement**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment and Assumption Agreement") is made and entered into as of _____, 2010, by and among Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a federal corporation extraprovincially registered in British Columbia, MTR Leasing, LLC, a Washington limited liability company, Geogenius, LLC, a Washington limited liability company ("Assignors"), and GTO, LLC, a Washington limited liability company ("Assignee").

RECITALS

A.     Assignors and Assignee are parties to that certain Asset Purchase Agreement dated as of _____, 2010 (the "Purchase Agreement"), pursuant to which Assignee has purchased, on the Closing Date, substantially all of the assets of Assignors; and

B.     Pursuant to the Purchase Agreement, Assignors have agreed to assign certain rights and agreements to Assignee, and Assignee has agreed to assume only those obligations of Assignors expressly set forth in this Assignment and Assumption Agreement, and Section 2.2 of the Purchase Agreement.

THEREFORE, the parties agree as follows:

1.     <u>Capitalized Terms</u>.  Capitalized terms used but not defined in this Assignment and Assumption Agreement shall have the meanings for such terms that are set forth in the Purchase Agreement.

2.     <u>Assignment and Assumption</u>.  Effective as of 12:01 a.m. (Pacific time) on the Closing Date (the "Effective Time"), Assignors hereby assign, sell, transfer and set over (collectively, the "Assignment") to Assignee all of Assignors' right, title, benefit, privileges and interest in and to, and all of Assignors' burdens, obligations and liabilities in connection with, each of the Assumed Liabilities.  Assignee hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities of Assignors to be observed, performed, paid or discharged from and after the Closing, in connection with the Assumed Liabilities.  Assignee assumes no liabilities of Seller other than the Assumed Liabilities, and the parties to this Assignment and Assumption Agreement agree that all other liabilities shall remain the sole responsibility of Assignors.

{01498055.DOC;5 }

3.  Terms of the Purchase Agreement.  The terms of the Purchase Agreement, including but not limited to Assignors' representations, warranties, covenants, agreements and indemnities relating to the Assumed Liabilities, are incorporated in this Assignment and Assumption Agreement by this reference.  Assignors and Assignee acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded by this Assignment and Assumption Agreement but shall remain in full force and effect to the full extent provided in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Assignment and Assumption Agreement, the terms of the Purchase Agreement shall govern.

4.  Further Actions.  Each of the parties to this Assignment and Assumption Agreement covenants and agrees, to execute and deliver, at its own expense, at the request of the other party to this Assignment and Assumption Agreement, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Assignment and Assumption Agreement.

5.  Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument and all of which together will be considered one and the same agreement, and will become effective when counterparts, that together contain the signatures of each party to this Assignment and Assumption Agreement, will have been delivered to Assignee and Assignors.  Delivery of executed signature pages by facsimile transmission and electronic mail will constitute effective and binding execution and delivery of this Assignment and Assumption Agreement.

[SIGNATURES ON FOLLOWING PAGE]

**ASSIGNORS:**

Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a federal corporation extraprovincially registered in British Columbia, MTR Leasing, LLC, a Washington limited liability company, Geogenius, LLC, a Washington limited liability company

By: _____
    Diana K. Carey, in her capacity as President, Manager and/or Trustee of the Assignors

**ASSIGNEE:**

GTO, LLC, a Washington limited liability company

By: _____
    H.S. Wright III
Its: Manager

Exhibit C
Form of Assignment of Seller Intellectual Property

## ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS

This Assignment Agreement ("Assignment Agreement") is made and entered into as of _____, 2010, by and among Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a federal corporation extraprovincially registered in British Columbia, MTR Leasing, LLC, a Washington limited liability company, Geogenius, LLC, a Washington limited liability company ("Assignors"), and GTO, LLC, a Washington limited liability company ("Assignee").

A.      Assignors and Assignee are parties to that certain Asset Purchase Agreement dated as of _____, 2010 (the "Purchase Agreement"), pursuant to which Assignee has purchased, on the Closing Date, substantially all of the assets of Assignors; and

B.      Pursuant to the Purchase Agreement, Assignors have agreed to assign its intellectual property rights to Assignee as expressly set forth in this Assignment Agreement, and Section 2.1(e) of the Purchase Agreement.

THEREFORE, the parties agree as follows:

1.      <u>Capitalized Terms</u>.  Capitalized terms used but not defined in this Assignment Agreement shall have the meanings for such terms that are set forth in the Purchase Agreement.

2.      <u>Assignment</u>. Effective as of 12:01 a.m. (Pacific time) on the Closing Date (the "Effective Time"), Assignors hereby assign, sell, transfer and set over (collectively, the "Assignment") to Assignee all of Assignors' right, title, benefit, privileges and interest in and to, and all of Assignor's burdens, obligations and liabilities in connection with, the Intellectual Property.

3.      <u>Terms of the Purchase Agreement</u>.   The terms of the Purchase Agreement, including but not limited to Assignors' representations, warranties, covenants, agreements and indemnities relating to the Intellectual Property, if any, are incorporated in this Assignment Agreement by this reference.   Assignors and Assignee acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded by this Assignment Agreement but shall remain in full force and effect to the full extent provided in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Assignment Agreement, the terms of the Purchase Agreement shall govern.

4.      <u>Further Actions</u>. Each of the parties to this Assignment Agreement covenants and agrees, to execute and deliver, at its own expense, at the request of the other party to this Assignment Agreement, such further instruments of transfer and assignment and to take such

{01498055.DOC;5 }

other action as such other party may reasonably request to more effectively consummate the assignments contemplated by this Assignment Agreement.

     5.   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument and all of which together will be considered one and the same agreement, and will become effective when counterparts, that together contain the signatures of each party to this Assignment Agreement, will have been delivered to Assignee and Assignors.  Delivery of executed signature pages by facsimile transmission and electronic mail will constitute effective and binding execution and delivery of this Assignment Agreement.

[SIGNATURES ON FOLLOWING PAGE]

**ASSIGNORS:**

Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a a federal corporation extraprovincially registered in British Columbia, MTR Leasing, LLC, a Washington limited liability company, Geogenius, LLC, a Washington limited liability company

By: _____
    Diana K. Carey, in her capacity as President, Manager and/or Trustee of the Assignors

**ASSIGNEE:**

GTO, LLC, a Washington limited liability company

By: _____
    H.S. Wright III
Its: Manager

{01498055.DOC;5 }

## CONFIDENTIALITY and NONDISCLOSURE AGREEMENT

This Agreement is effective as of the date it is executed by both of the undersigned parties to the Agreement.

## RECITALS

A.    **Diana K. Carey**, in her capacity as Chapter 11 trustee ("Trustee") appointed in the bankruptcy case of Frederick Darren Berg ("Berg") in the U.S. Bankruptcy Court for the Western District of Washington, Case No. 10-18668-KAO, is operating a number of transportation companies which were formerly owned and operated by Berg, including but not necessarily limited to Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (USA), Inc., a Washington corporation, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a British Columbia limited company, MTR Leasing, LLC, a Washington limited liability company, CGT Enterprises, Inc., an Oregon corporation, Columbia Gorge Tours, Inc., an Oregon corporation, Oregon Coachways, Inc., an Oregon corporation (dba OC&W) (collectively referred to as the "Company").

B.    The undersigned ("Recipient") has expressed interest in purchasing the Company or the Company's business assets, and as part of Recipient's due diligence may desire to evaluate the Company's business records.

C.    Company is similarly interested in entering into discussions with the Recipient about an acquisition of the Company or its assets and is willing to provide the Recipient access to its business records upon certain terms and conditions.

D.    Company and Recipient agree this Confidentiality Agreement is necessary to protect Company's business and that Company has been induced to disclose any and all business records to Recipient in reliance upon the mutual covenants and agreements set forth below.

NOW, THEREFORE, based upon the above recitals, the parties covenant and agree as follows:

## AGREEMENT

1.    **Disclosure.**  Company shall provide Recipient with provisional possession of and review of copies of business records for the sole purpose of assessing its interest in acquiring the Company's business assets[3].  Recipient acknowledges and agrees that Company would not have

---

[3] Recipient is defined to include shareholders, officers, directors, employees, advisors and agents and affiliated entities of the party referred to in the Recital B above, and each such additional Recipient may receive business records derivatively, but sign this Agreement to indicate acceptance of the confidentiality and other restrictive terms of this Agreement.

disclosed any business records to the Recipient without the Recipient's covenants set forth herein, that all business records previously provided (if any) were intended to be subject to the terms of this Agreement; and agree that all such covenants and agreements are reasonable and necessary for the protection of the Company's business and operations.

**2.** **Nonuse and Nondisclosure.**  Recipient shall at no time disclose, use, or derive benefit from (other than in its assessment of business records for purposes stated above), or permit any other person to examine, disclose, use, or derive benefit from, the business records without the prior written consent of Company which consent may be given or denied in its sole discretion. Recipient shall maintain all parts of the business records and all information (including but not limited to Company's identity) and data contained therein in confidence, and shall take reasonable precautions to preserve such confidentiality.  Recipient shall protect the business records and such information and data contained therein by using the same degree of care Recipient uses for its own confidential information and shall be liable for any unauthorized use or disclosure by Recipient's officers, employees, representatives or agents.  The business records delivered to Recipient shall at all times remain the proprietary property of Company.  Upon written demand by Company, Recipient shall forthwith deliver, and as necessary, cause any others under its control to deliver, all copies in whatever form of the business records to Company.  Notwithstanding the above, Recipient shall not be obligated to maintain the confidentiality of information contained in business records provided by Company to Recipient if such information is (i) lawfully obtained by Recipient from any third party who has lawfully obtained such information; or (ii) generally available to the public or is later published or generally disclosed to the public by the Company.

**3.** **Confidentiality of Agreement.**  Recipient shall not at any time disclose, or permit any other person to disclose, the existence of this Agreement without the prior written consent of Company which consent may be given or denied in Company's sole discretion.  Recipient shall be liable for any unauthorized disclosure of the existence of this Confidentiality Agreement by its respective officers, employees, representatives or agents.

**4.** **Unauthorized Contact with Agents or Employees.**  During the course of preparation of their assessment, the Recipient, including its shareholders, officers, directors, employees, advisors and agents and any of its affiliated entities, shall not engage in any contact or have any discussion of any nature whatsoever with employees, advisors or agents of Company, with the exception of those individuals specifically designated, in writing, as the authorized spokesperson(s) for Company, and with the exception of those contacts and discussions carried on in the ordinary course of business. Trustee, Trustee's counsel, Eric Orse, are the authorized spokespersons for the Company.

**5.** **Unauthorized Contact with Customers or Vendors.**  During the course of preparation of their assessment, the shareholders, officers, directors, employees, advisors and agents of Recipient, and any affiliated entities, shall be entitled to receive and review the business records, but shall not engage in any contact or have any discussion of any nature whatsoever pertaining to the Company with customers, service providers or vendors of Company, without the prior consent of Company which consent may be given or denied in Company's sole discretion.

If the Recipient or its affiliates operate transportation business(es) which compete with the Company in one or more markets and/or use certain vendors which the Company also uses, the provisions of this Section 5 are intended to protect the Company's business relationships while not restricting the Recipient from engaging in the ordinary course of its business, except as otherwise required under this Agreement.

**6.** **Unauthorized Contact with Customers or Vendors.** During the course of preparation of their assessment, the shareholders, officers, directors, employees, advisors and agents of Recipient, and any affiliated entities, shall be entitled to receive and review the business records, but shall not engage in any contact or have any discussion of any nature whatsoever with customers, service providers or vendors of Company, without the prior consent of Company which consent may be given or denied in Company's sole discretion.

**7.** **Breach.** If any of the terms and conditions of this Confidentiality Agreement are breached or otherwise violated, the nonviolator shall have the right to:

a. Recover from the violator its actual damages incurred by reason of such breach, including its costs and reasonable attorneys' fees whether or not a lawsuit or other action or proceeding is commenced; and

b. Obtain injunctive relief to prevent the unauthorized disclosure or use of the Confidential Material or to otherwise enforce the terms of this Confidentiality Agreement; and

c. Pursue any other remedy available at law or in equity.

**7.** **General.**

a. <u>Survival</u>. This Confidentiality Agreement shall remain in full force unless specifically terminated or modified by a writing signed by all parties.

b. <u>Applicable Law and Venue</u>. This Confidentiality Agreement shall be interpreted in accordance with the laws of the State of Washington. Any legal action or proceeding to enforce or interpret the terms of this Confidentiality Agreement shall be brought in the United States Bankruptcy Court for the Western District of Washington.

c. <u>Authority</u>. Persons executing this Agreement on behalf of a partnership, limited liability company, corporation or other form of company affirms that he or she has the authority to enter into this Agreement on behalf of his or her respective companies.

d. <u>Binding on Employees, Agents and Representatives</u>. This Confidentiality Agreement is entered into by the Recipient on its own behalf and on behalf of all of its employees, agents and representatives, and shall be binding on all such employees, agents and representatives to the same extent it binds the Recipient. Recipient shall be liable for any breach of this Agreement by its respective employees, agents or representatives. Notwithstanding the forgoing, the Recipient shall obtain signatures from its employees, agents and representatives, who are presented with any of the business records or other proprietary or confidential documents of the Company as allowed under this Agreement.

e.    <u>Counterparts, Facsimile/Email</u>.  This Agreement may be executed in two or more counterparts.  Executed copies of this Agreement transmitted by facsimile and electronic mail shall be deemed to be originals.

**Trustee**                                          **Recipient:** _____

_____                           _____
**Diana K. Carey**                                  **Printed Name:**

Date_____                            Date_____

Exhibit E

Proposed Form of Sale Order

Schedule 2.1(b) – Tangible Personal Property
(To be inserted prior to Bid Procedure Hearing)

Schedule 2.1(l) – Motor Coaches
(To be inserted prior to Bid Procedure Hearing)

Schedule 2.1(m) – Other Assets
(To be inserted prior to Bid Procedure Hearing)

Schedule 2.7 – Allocation Schedule
(To be inserted prior to Bid Procedure Hearing)

Schedule 2.8 – Employee Information
(To be inserted prior to Bid Procedure Hearing)

Schedule 4.5 – Exceptions to Asset Title Warranty
(To be inserted prior to Bid Procedure Hearing)



Schedule 4.7 – Existing Contract List / Exceptions to Existing Contract Warranty
(To be inserted prior to Bid Procedure Hearing)

Schedule 4.8 – Litigation
(To be inserted prior to Bid Procedure Hearing)

Schedule 4.13 – Taxes
(To be inserted prior to Bid Procedure Hearing)

Schedule 4.15 – Location of Assets (other than Motor Coaches)
(To be inserted prior to Bid Procedure Hearing)

Schedule 4.20 – Customer Issues
(To be inserted prior to Bid Procedure Hearing)