Exhibit A

Proposed Form of Bidding Procedures Order

DEC 15 2010

by JM 2:25

Exhibit B
Form of Assignment and Assumption Agreement for Assumed Executory
Contracts and the Assumed Liabilities

## Assignment and Assumption Agreement

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment and Assumption Agreement") is made and entered into as of _____, 2010, by and among Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a federal corporation extraprovincially registered in British Columbia, MTR Leasing, LLC, a Washington limited liability company, Geogenius, LLC, a Washington limited liability company ("Assignors"), and GTO, LLC, a Washington limited liability company ("Assignee").

RECITALS

A. Assignors and Assignee are parties to that certain Asset Purchase Agreement dated as of _____, 2010 (the "Purchase Agreement"), pursuant to which Assignee has purchased, on the Closing Date, substantially all of the assets of Assignors; and

B. Pursuant to the Purchase Agreement, Assignors have agreed to assign certain rights and agreements to Assignee, and Assignee has agreed to assume only those obligations of Assignors expressly set forth in this Assignment and Assumption Agreement, and Section 2.2 of the Purchase Agreement.

THEREFORE, the parties agree as follows:

1. <u>Capitalized Terms</u>. Capitalized terms used but not defined in this Assignment and Assumption Agreement shall have the meanings for such terms that are set forth in the Purchase Agreement.

2. <u>Assignment and Assumption</u>. Effective as of 12:01 a.m. (Pacific time) on the Closing Date (the "Effective Time"), Assignors hereby assign, sell, transfer and set over (collectively, the "Assignment") to Assignee all of Assignors' right, title, benefit, privileges and interest in and to, and all of Assignors' burdens, obligations and liabilities in connection with, each of the Assumed Liabilities. Assignee hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities of Assignors to be observed, performed, paid or discharged from and after the Closing, in connection with the Assumed Liabilities. Assignee assumes no liabilities of Seller other than the Assumed Liabilities, and the parties to this Assignment and Assumption Agreement agree that all other liabilities shall remain the sole responsibility of Assignors.

3. **Terms of the Purchase Agreement.** The terms of the Purchase Agreement, including but not limited to Assignors' representations, warranties, covenants, agreements and indemnities relating to the Assumed Liabilities, are incorporated in this Assignment and Assumption Agreement by this reference. Assignors and Assignee acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded by this Assignment and Assumption Agreement but shall remain in full force and effect to the full extent provided in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Assignment and Assumption Agreement, the terms of the Purchase Agreement shall govern.

4. **Further Actions.** Each of the parties to this Assignment and Assumption Agreement covenants and agrees, to execute and deliver, at its own expense, at the request of the other party to this Assignment and Assumption Agreement, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Assignment and Assumption Agreement.

5. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument and all of which together will be considered one and the same agreement, and will become effective when counterparts, that together contain the signatures of each party to this Assignment and Assumption Agreement, will have been delivered to Assignee and Assignors. Delivery of executed signature pages by facsimile transmission and electronic mail will constitute effective and binding execution and delivery of this Assignment and Assumption Agreement.

[SIGNATURES ON FOLLOWING PAGE]

**ASSIGNORS:**

Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a federal corporation extraprovincially registered in British Columbia, MTR Leasing, LLC, a Washington limited liability company, Geogenius, LLC, a Washington limited liability company

By: _____
Diana K. Carey, in her capacity as President, Manager and/or Trustee of the Assignors

**ASSIGNEE:**

GTO, LLC, a Washington limited liability company

By: _____
H.S. Wright III
Its: Manager

Exhibit C
Form of Assignment of Seller Intellectual Property

## ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS

This Assignment Agreement ("Assignment Agreement") is made and entered into as of _____, 2010, by and among Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a federal corporation extraprovincially registered in British Columbia, MTR Leasing, LLC, a Washington limited liability company, Geogenius, LLC, a Washington limited liability company ("Assignors"), and GTO, LLC, a Washington limited liability company ("Assignee").

A. Assignors and Assignee are parties to that certain Asset Purchase Agreement dated as of _____, 2010 (the "Purchase Agreement"), pursuant to which Assignee has purchased, on the Closing Date, substantially all of the assets of Assignors; and

B. Pursuant to the Purchase Agreement, Assignors have agreed to assign its intellectual property rights to Assignee as expressly set forth in this Assignment Agreement, and Section 2.1(e) of the Purchase Agreement.

THEREFORE, the parties agree as follows:

1. Capitalized Terms. Capitalized terms used but not defined in this Assignment Agreement shall have the meanings for such terms that are set forth in the Purchase Agreement.

2. Assignment. Effective as of 12:01 a.m. (Pacific time) on the Closing Date (the "Effective Time"), Assignors hereby assign, sell, transfer and set over (collectively, the "Assignment") to Assignee all of Assignors' right, title, benefit, privileges and interest in and to, and all of Assignor's burdens, obligations and liabilities in connection with, the Intellectual Property.

3. Terms of the Purchase Agreement. The terms of the Purchase Agreement, including but not limited to Assignors' representations, warranties, covenants, agreements and indemnities relating to the Intellectual Property, if any, are incorporated in this Assignment Agreement by this reference. Assignors and Assignee acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded by this Assignment Agreement but shall remain in full force and effect to the full extent provided in the Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Assignment Agreement, the terms of the Purchase Agreement shall govern.

4. Further Actions. Each of the parties to this Assignment Agreement covenants and agrees, to execute and deliver, at its own expense, at the request of the other party to this Assignment Agreement, such further instruments of transfer and assignment and to take such

{01498055.DOC;9 }

GTO/MTR Asset Purchase Agreement

other action as such other party may reasonably request to more effectively consummate the assignments contemplated by this Assignment Agreement.

5. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be considered an original instrument and all of which together will be considered one and the same agreement, and will become effective when counterparts, that together contain the signatures of each party to this Assignment Agreement, will have been delivered to Assignee and Assignors. Delivery of executed signature pages by facsimile transmission and electronic mail will constitute effective and binding execution and delivery of this Assignment Agreement.

[SIGNATURES ON FOLLOWING PAGE]

**ASSIGNORS:**

Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a a federal corporation extraprovincially registered in British Columbia, MTR Leasing, LLC, a Washington limited liability company, Geogenius, LLC, a Washington limited liability company

By: _____
    Diana K. Carey, in her capacity as President, Manager and/or Trustee of the Assignors

**ASSIGNEE:**

GTO, LLC, a Washington limited liability company

By: _____
    H.S. Wright III
Its: Manager

Exhibit D
Form of Confidentiality and Non-disclosure Agreement

## CONFIDENTIALITY and NONDISCLOSURE AGREEMENT

This Agreement is effective as of the date it is executed by both of the undersigned parties to the Agreement.

### RECITALS

A.  **Diana K. Carey**, in her capacity as Chapter 11 trustee ("Trustee") appointed in the bankruptcy case of Frederick Darren Berg ("Berg") in the U.S. Bankruptcy Court for the Western District of Washington, Case No. 10-18668-KAO, is operating a number of transportation companies which were formerly owned and operated by Berg, including but not necessarily limited to Meridian Transportation Resources, LLC, a Washington limited liability company, Meridian Transportation Resources (USA), Inc., a Washington corporation, Meridian Transportation Resources (California), LLC, a California limited liability company, Meridian Transportation Resources (Canada), Ltd., a British Columbia limited company, MTR Leasing, LLC, a Washington limited liability company, CGT Enterprises, Inc., an Oregon corporation, Columbia Gorge Tours, Inc., an Oregon corporation, Oregon Coachways, Inc., an Oregon corporation (dba OC&W) (collectively referred to as the "Company").

B.  The undersigned ("Recipient") has expressed interest in purchasing the Company or the Company's business assets, and as part of Recipient's due diligence may desire to evaluate the Company's business records.

C.  Company is similarly interested in entering into discussions with the Recipient about an acquisition of the Company or its assets and is willing to provide the Recipient access to its business records upon certain terms and conditions.

D.  Company and Recipient agree this Confidentiality Agreement is necessary to protect Company's business and that Company has been induced to disclose any and all business records to Recipient in reliance upon the mutual covenants and agreements set forth below.

NOW, THEREFORE, based upon the above recitals, the parties covenant and agree as follows:

### AGREEMENT

1.  **Disclosure.** Company shall provide Recipient with provisional possession of and review of copies of business records for the sole purpose of assessing its interest in acquiring the Company's business assets[4]. Recipient acknowledges and agrees that Company would not have

---

[4] Recipient is defined to include shareholders, officers, directors, employees, advisors and agents and affiliated entities of the party referred to in the Recital B above, and each such additional Recipient may receive business records derivatively, but sign this Agreement to indicate acceptance of the confidentiality and other restrictive terms of this Agreement.

{01498055.DOC;9 }

disclosed any business records to the Recipient without the Recipient's covenants set forth herein, that all business records previously provided (if any) were intended to be subject to the terms of this Agreement; and agree that all such covenants and agreements are reasonable and necessary for the protection of the Company's business and operations.

2. **Nonuse and Nondisclosure.** Recipient shall at no time disclose, use, or derive benefit from (other than in its assessment of business records for purposes stated above), or permit any other person to examine, disclose, use, or derive benefit from, the business records without the prior written consent of Company which consent may be given or denied in its sole discretion. Recipient shall maintain all parts of the business records and all information (including but not limited to Company's identity) and data contained therein in confidence, and shall take reasonable precautions to preserve such confidentiality. Recipient shall protect the business records and such information and data contained therein by using the same degree of care Recipient uses for its own confidential information and shall be liable for any unauthorized use or disclosure by Recipient's officers, employees, representatives or agents. The business records delivered to Recipient shall at all times remain the proprietary property of Company. Upon written demand by Company, Recipient shall forthwith deliver, and as necessary, cause any others under its control to deliver, all copies in whatever form of the business records to Company. Notwithstanding the above, Recipient shall not be obligated to maintain the confidentiality of information contained in business records provided by Company to Recipient if such information is (i) lawfully obtained by Recipient from any third party who has lawfully obtained such information; or (ii) generally available to the public or is later published or generally disclosed to the public by the Company.

3. **Confidentiality of Agreement.** Recipient shall not at any time disclose, or permit any other person to disclose, the existence of this Agreement without the prior written consent of Company which consent may be given or denied in Company's sole discretion. Recipient shall be liable for any unauthorized disclosure of the existence of this Confidentiality Agreement by its respective officers, employees, representatives or agents.

4. **Unauthorized Contact with Agents or Employees.** During the course of preparation of their assessment, the Recipient, including its shareholders, officers, directors, employees, advisors and agents and any of its affiliated entities, shall not engage in any contact or have any discussion of any nature whatsoever with employees, advisors or agents of Company, with the exception of those individuals specifically designated, in writing, as the authorized spokesperson(s) for Company, and with the exception of those contacts and discussions carried on in the ordinary course of business. Trustee, Trustee's counsel, Eric Orse, are the authorized spokespersons for the Company.

5. **Unauthorized Contact with Customers or Vendors.** During the course of preparation of their assessment, the shareholders, officers, directors, employees, advisors and agents of Recipient, and any affiliated entities, shall be entitled to receive and review the business records, but shall not engage in any contact or have any discussion of any nature whatsoever pertaining to the Company with customers, service providers or vendors of Company, without the prior consent of Company which consent may be given or denied in Company's sole discretion.

If the Recipient or its affiliates operate transportation business(es) which compete with the Company in one or more markets and/or use certain vendors which the Company also uses, the provisions of this Section 5 are intended to protect the Company's business relationships while not restricting the Recipient from engaging in the ordinary course of its business, except as otherwise required under this Agreement.

6. **Unauthorized Contact with Customers or Vendors.** During the course of preparation of their assessment, the shareholders, officers, directors, employees, advisors and agents of Recipient, and any affiliated entities, shall be entitled to receive and review the business records, but shall not engage in any contact or have any discussion of any nature whatsoever with customers, service providers or vendors of Company, without the prior consent of Company which consent may be given or denied in Company's sole discretion.

7. **Breach.** If any of the terms and conditions of this Confidentiality Agreement are breached or otherwise violated, the nonviolator shall have the right to:

 a. Recover from the violator its actual damages incurred by reason of such breach, including its costs and reasonable attorneys' fees whether or not a lawsuit or other action or proceeding is commenced; and

 b. Obtain injunctive relief to prevent the unauthorized disclosure or use of the Confidential Material or to otherwise enforce the terms of this Confidentiality Agreement; and

 c. Pursue any other remedy available at law or in equity.

7. **General.**

 a. **Survival.** This Confidentiality Agreement shall remain in full force unless specifically terminated or modified by a writing signed by all parties.

 b. **Applicable Law and Venue.** This Confidentiality Agreement shall be interpreted in accordance with the laws of the State of Washington. Any legal action or proceeding to enforce or interpret the terms of this Confidentiality Agreement shall be brought in the United States Bankruptcy Court for the Western District of Washington.

 c. **Authority.** Persons executing this Agreement on behalf of a partnership, limited liability company, corporation or other form of company affirms that he or she has the authority to enter into this Agreement on behalf of his or her respective companies.

 d. **Binding on Employees, Agents and Representatives.** This Confidentiality Agreement is entered into by the Recipient on its own behalf and on behalf of all of its employees, agents and representatives, and shall be binding on all such employees, agents and representatives to the same extent it binds the Recipient. Recipient shall be liable for any breach of this Agreement by its respective employees, agents or representatives. Notwithstanding the forgoing, the Recipient shall obtain signatures from its employees, agents and representatives, who are presented with any of the business records or other proprietary or confidential documents of the Company as allowed under this Agreement.

e. <u>Counterparts, Facsimile/Email</u>. This Agreement may be executed in two or more counterparts. Executed copies of this Agreement transmitted by facsimile and electronic mail shall be deemed to be originals.

**Trustee**

_____
**Diana K. Carey**

Date_____

**Recipient:** _____

_____
**Printed Name:**

Date_____

# Exhibit E

## Proposed Form of Sale Order

EXHIBIT F

Form of Promissory Note

**PROMISSORY NOTE**

$750,000.00                                                                 Seattle, Washington

_____, ____

FOR VALUE RECEIVED, GTO, L.L.C., a Washington limited liability company ("Maker") hereby promises to pay to the order of [_____] ("Holder") at such place as Holder from time to time may designate, in writing, the principal sum of Seven Hundred Fifty Thousand Dollars ($750,000.00), together with interest accrued as provided herein on the unpaid balance thereof and such other sums as are herein referred to, in lawful money of the United States of America and in immediately available funds. This promissory note is given in connection with that certain Amended and Restated Asset Purchase Agreement between Maker and [[Holder]] dated as of December ___, 2010 ("Asset Purchase Agreement"). The terms of the Asset Purchase Agreement are incorporated herein by this reference, including without limitation, Purchaser's right of offset contained therein. Maker will borrow funds from an institutional lender in order to close on the Asset Purchase Agreement ("APA Financing").

1. *Interest Rate.* Interest shall accrue on the unpaid balance of the principal sum of this promissory note from the date hereof at a rate equal to the then-applicable Note Rate (as hereinafter defined). The "Note Rate" means _____

_____
[[the interest rate set in the APA Financing]] .

2. *Payments of Interest and Principal.* Principal and interest shall be paid as follows:

(a) Payments of principal and accrued interest shall be due and payable as follows: $250,000.00 plus all accrued but unpaid interest shall be due and payable on _____, 2012 and _____, 2013; and

(b) The balance of all unpaid principal and accrued interest on this promissory note shall be due and payable in full on _____, 2014.

3. *Application of Payments.* Each payment received hereunder from Maker shall be applied first to pay or reimburse Holder for costs or expenses described in paragraph 8 hereof; then to pay and reduce interest accrued hereunder and lastly to pay and reduce the unpaid balance of the principal sum of this promissory note.

4. *Prepayment.* All amounts required to be paid hereunder may be prepaid, in Maker's discretion, in whole or in part and at any time, without premium, penalty or discount. All prepayments shall be applied in the reverse order of maturity and shall result in a corresponding reduction in the total number of payments hereunder and the term hereof.

{01498055.DOC;9 }

GTO/MTR Asset Purchase Agreement

5. **Default.** Maker shall be in default upon the occurrence of any of the following events: (*i*) Maker fails to make payments when required hereunder; (*ii*) Maker files a petition for relief under the 11 U.S.C. § 1 et seq., or any similar Federal or state statute; (*iii*) Maker is served with an involuntary petition for relief under 11 U.S.C. § 1 et seq., and such petition or proceeding is not dismissed within 90 days; or (*iv*) Maker breaches any covenants contained paragraph 8 below.

6. **Cure Rights.** Holder shall forbear from pursuing any remedies hereunder unless and until Maker fails, within the Applicable Period, to cure the default. Maker shall cease to be in default if the default is cured within such time. "Applicable Period" means five (5) days in the case of a default under paragraph 5(i) and thirty (30) days in the case of a default under paragraphs 5(ii) or 5(iii) or 5(iv).

7. **Remedies.** Upon or at any time after the occurrence of any default under paragraph 5 of this Note that has not been cured within the Applicable Period:

(1) The entire unpaid principal balance, advances, any unpaid interest, and any other amounts owing under this Note shall immediately become due and payable; and

(2) The Holder shall have and may exercise any and all rights and remedies available at law or in equity. The remedies of the Holder, as provided in this Note, shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefore shall arise; and

(3) The unpaid principal balance of this Note shall thereafter bear interest at a variable rate two percent (2%) per annum above the Note Rate that would otherwise have been applicable from time to time (the "Default Rate").

8. **Covenants.** So long as amounts remain outstanding on this promissory note, Maker shall (i) provide unaudited quarterly financial statements to Holder no later than 45 days after the end of each calendar quarter; and (ii) comply with all covenants related to working capital requirements contained in the APA Financing.

9. **Attorneys' Fees.** Maker agrees to pay all costs and expenses that Holder may incur in enforcing this promissory note upon Maker being in default hereunder (including, without limitation, reasonable attorneys' fees and court costs, expenses and costs incurred at the trial and appellate levels). All amounts due hereunder shall be added to, and treated as, additional principal on a loan made to Maker from the date such expenses and costs are incurred and interest shall accrue and be payable with respect to such amounts, all of which shall be payable on demand.

10. **Waivers.** Maker hereby (*i*) waives presentment, demand for payment, notice of dishonor, protest, and notice of nonpayment, and any and all other notices and demands whatsoever, and (*ii*) consents to extensions of time, renewals, releases, waivers or modifications that may be granted by the Holder. No covenant, condition, right or remedy in this promissory note may be waived or modified orally, by course of conduct or otherwise, unless such waiver or modification is specifically agreed to in writing executed by Holder. Holder's failure to require

strict performance of any term hereof shall not constitute a waiver of Holder's right to require strict performance of such term in the future.

11. **_Holder._** Any reference to Holder in this promissory note shall include any permitted successor to or permitted assignee of this promissory note. Holder shall not assign or transfer this promissory note without the prior written consent of Maker which consent shall not be unreasonably witheld. The parties agree that it shall not be unreasonable to withhold consent if in connection with any transfer of this promissory note, Holder does not: (i) deliver to the potential assignee copies of the Asset Purchase Agreement; and (ii) require that the potential assignee agree (A) to be subject to all of the terms and conditions of the Asset Purchase Agreement related to the promissory note, including Maker's right of offset and (B) that the potential assignee is subject to all defenses and offsets and claims which may be brought by Maker.

12. **_Governing Law; Venue._** This promissory note shall be governed by and construed in accordance with the laws of the state of Washington. The parties hereto irrevocably submit to the exclusive jurisdiction of the United States Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this promissory note and any such dispute shall be deemed to have arisen in the State of Washington.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

MAKER:  GTO, L.L.C.

By: _____
Name: H.S. Wright III
Title: Manager

{01498055.DOC;9 }

GTO/MTR Asset Purchase Agreement